**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| TOMMY L. FENLEY, WILLIAM PEVETO, BROCKROBERT TAGAROOK, AND LEWIS WHITMIRE, *Individually and on Behalf of All Persons Similarly Situated*,<br><br>                               **Plaintiffs,**<br><br>     **v.**<br><br>WOOD GROUP MUSTANG, INC.,<br>                        **Defendant.** | Civil Action No.:  2:15-cv-326<br><br>CIVIL ACTION<br>COLLECTIVE AND CLASS ACTION |

<u>**DEFENDANT'S MEMORANDUM IN SUPPORT OF
MOTION TO DECERTIFY CONDITIONALLY CERTIFIED CLASS**</u>

     **NOW COMES** Defendant, Wood Group Mustang, Inc. ("Defendant" or "WGM"), through undersigned counsel, and submits this Memorandum in Support of its Motion  to Decertify pursuant to 29 U.S.C. §216(b).

## TABLE OF CONTENTS

Table of Authorities   ...............................................................................................7

Overview                   ...........................................................................................13

Plaintiffs bring this Fair Labor Standards Act ("FLSA") case on behalf of a putative class comprised of pipeline inspectors, who allege that they were improperly paid a non-salary day rate, which improperly excluded overtime pay.   To maintain this action as a collective action and to survive this Motion to Decertify, Plaintiffs must prove that all 93 Opt-In Plaintiffs are similarly situated.   They cannot do so.   The legally-significant differences between each Opt-In Plaintiff's claims, the evidence required to prove those claims, and WGM's defenses outweigh Plaintiffs' generalizations and render Plaintiffs unable to prove that they are similarly situated.   For these reasons, and those more fully explained herein, WGM respectfully requests that the Court decertify this conditionally-certified collective action and dismiss the Opt-In Plaintiffs' claims without prejudice.

Summary of the Argument   ....................................................................................14

Legal Standard for Decertification ........................................................................17

Argument and Authorities .....................................................................................19

   I.   **Plaintiffs Fail to Meet Their Burden of Proof That They
        Are Similarly Situated** ...........................................................................19

        A.   **Plaintiffs Are Not Similarly Situated Based on a Common Policy or
             Plan Due To Defendant's Use of a Guaranteed Weekly Salary Based
             on a Day Rate** ...............................................................................19

The evidence shows that Plaintiffs received a weekly day-rate guarantee of five, six or seven days, thereby satisfying the salary-basis requirement, which mandates that an employee regularly receive a predetermined amount each pay period. 29 C.F.R. § 541.602(a); *McReynolds v. Pocahontas Corp.*, 192 F.2d 301, 303 (4th Cir. 1951) ("Any formula which results in [] a guarantee is sufficient" to satisfy the salary basis test); *ACS v. Detroit Edison Co.*, 444 F.3d 763, 770 (6th Cir. 2006) (nothing in the FLSA "circumscribes an employer's authority to choose the mechanics of a compensation system that suits its business needs").

An employer's actual pay practices need not be evidenced by any formal agreement to establish that an employee was paid a predetermined amount satisfying the salary basis test. *Orton v. Johnny's Lunch Franchise*, 668 F.3d 843, 847-48 (6th Cir. 2012).  Thus, the "predetermined amount" element of the salary basis test is proven by Defendant's actual pay practices and confirmed by the verbal explanation of the guarantee that Plaintiffs received at the outset of their employment with Defendant.

2

**B. Plaintiffs Are Not Similarly Situated Because Several Opt-In Plaintiffs Always Received Their Weekly Day Rate Guarantee and Did Not Suffer Any Damages**.............................................................................................**25**

Defendant's pay records show that nearly two dozen Opt-In Plaintiffs always received their full weekly day rate guarantee and therefore are not similarly situated to those Plaintiffs who did not receive their full salary.  Additionally, Opt-In Plaintiffs who always received their full guarantee did not suffer any damages.  See *Rindfleisch v. Gentiva Health Servs., Inc.*, 22 F. Supp. 3d 1295, 1303 (N.D. Ga. 2014) ( "every Plaintiff has to actually be owed overtime compensation in a collective action solely seeking overtime damages," "[a] collective action is improper when actual liability cannot be established on a class-wide basis," and that as "a general rule, a group of opt-in plaintiffs cannot be similarly situated for purposes of a collective action when individual determinations regarding liability must be made."); *Willoughby v. Youth Villages, Inc.*, 113 F. Supp. 3d 1265, 1275 (N.D. Ga. 2015) (decertifying class because some plaintiffs suffered no damages).

**C. Plaintiffs Are Not Similarly Situated Because Any Claimed Violations of the Salary Basis Test Implicate Individualized Inquiries About the Reasons Why Any Particular Plaintiff Was Not Paid On Any Particular Day On Any Particular Project** ..................................................................**26**

In certain limited circumstances, employers may deduct from an exempt employee's salary without losing the exemption, including, for example, when the employee takes personal time off and no work is performed.  Opt-In Plaintiffs worked on a total of at least 130 projects combined.  Whether and to what extent Opt-In Plaintiffs were paid for holidays and/or other time off varied from project to project.  To determine whether the exemption is lost as to a particular Plaintiff for a particular week on a particular project requires a determination of the reasons for the deduction, and is not susceptible to resolution on a collective basis.  *See, e.g.*, *Frye v. Baptist Mem'l Hosp., Inc.*, 495 F. App'x 669, 673 (6th Cir. 2012) (affirming decertification of collective action where the sole common theory of liability rested upon a facially lawful pay policy that "cannot serve as the lone point of similarity supporting class certification" and where the remaining factual circumstances at issue "rely on employees' unique experiences").

**D. Resolution of Defendant's Exemption Defenses Will Require Significant Individualized Factfinding, Rendering Collective Adjudication Inappropriate.** ..................................................................**28**

Defendant asserts a number of affirmative defenses which can only be evaluated on an individual basis, given variations in the job duties, responsibilities, and authority exercised by Opt-In Plaintiffs who together held at least 13 different positions during the class period and worked on at least 130 different projects combined.

1.      **Administrative Exemption**  .....................................................................32

Courts have repeatedly found that pipeline inspectors are subject to the Administrative Exemption because their primary duty consists of the performance of non-manual oil and gas pipeline inspection work directly related to the general business operations of their employer's customers and requires the exercise of independent discretion and judgment. *O'Dell v. Alyseka Pipeline Serv. Co.*, 856 F.2d 1452 (9th Cir. 1988); *Brock v. On Shore Quality Control Specialists, Inc.*, No. A-84-CA-603, 1987 WL 31308 (W.D. Tex. Sept. 29, 1987).

To evaluate application of the Administrative Exemption to Opt-In Plaintiffs in this case requires individualized inquiries regarding, among other things, the primary duties of each Opt-In Plaintiff and whether those duties required the Plaintiff to exercise discretion and independent judgment with respect to matters of significance.  These inquiries necessarily require an assessment of the frequency, duration, and manner in which duties were performed—an assessment that is different for each Opt-In Plaintiff, is fact-intensive, and therefore cannot be made on a collective basis. *Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 220 (D. Conn. 2003).

2.      **Executive Exemption**  ............................................................................35

To evaluate application of the Executive Exemption, individualized inquiries are necessary to determine, among other things, whether the employee "customarily and regularly directs the work of two or more other employees," and whether s/he "has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100.  Because the job duties, reporting relationships and organizational structure of supervisory positions like Chief Inspector and Assistant Chief Inspector varied greatly based upon project-specific factors, there is no generalized set of facts or single analysis for determining whether individual Opt-In Plaintiffs are subject to the Executive Exemption.

3.      **Combination Exemption**  .......................................................................36

Under the combination exemption, the time an employee spends performing duties exempted under one FLSA exemption may be combined with the time the employee spends performing duties exempted under another FLSA exemption to qualify the employee for exemption. 29 C.F.R. § 541.708.  For example, an Opt-In Plaintiff whose primary duty involves a combination of administrative duties (such as compiling other Inspectors' reports each day for submission to the Chief

Inspector) and executive duties (supervising other Inspectors) may qualify as exempt under the combination exemption. Evaluation of whether the combination exemption applies to a particular Opt-In Plaintiff requires an individualized analysis of that Plaintiff's duties, authority, and work performed.

**4.     Highly Compensated Employee Exemption** ........................................37

The Highly Compensated Employee Exemption applies to Opt-In Plaintiffs who earned over $100,000 in annual compensation, performed non-manual work, and regularly performed at least one of the exempt duties of an exempt Executive or Administrative employee. 29 C.F.R. § 541.601(a). Many, although not all, of the Opt-In Plaintiffs earned over $100,000 per year during the years they worked for Defendant.

Courts have recognized that collective actions with both highly and non-highly compensated plaintiffs are subject to decertification. 29 C.F.R. § 541.601(a); *McPherson v. LEAM Drilling Systems, LLC*, No. 4:14-CV-02361, 2015 WL 1470554 (S.D. Tex. Mar. 30, 2015) (expressing doubt as to whether a class that includes both highly-compensated and non-highly-compensated plaintiffs can survive decertification stage); *Beauperthuy v. 24 Hour Fitness USA, Inc.*, 772 F. Supp. 2d 1111, 1132-33 (N.D. Cal. 2011) (decertifying a collective class because, *inter alia*, the defendant was asserting several exemption defenses, including the highly compensated employee exemption). Because this Court must analyze whether <u>each</u> Opt-In Plaintiff customarily and regularly performed <u>any one or more</u> exempt duties or responsibilities of an Executive or Administrative employee in order to evaluate application of the Highly-Compensated Employee Exemption, resolution on a collective basis is not feasible.

**E.  Considerations of Fairness and Manageability Support Decertification** .............40

There is little, if any, overlap of proof from one Opt-In Plaintiff's claim to another, given that they worked on different pipelines in different job classifications and inspected different crews performing different work. Opt-In Plaintiffs share no common thread and they offer no reasons why resolution of an FLSA claim for a Welding Inspector who worked on the Tallgrass project in Ohio is any way comparable to or in any would expedite resolution of a claim brought by a Chief Inspector who worked for Kinder Morgan on a project in Texas. See *Harrison v. Delguerico's Wrecking & Salvage, Inc.*, No. CV 13-5353, 2016 WL 826824, at *7 (E.D. Pa. Mar. 2, 2016) ("[T]his Court must also consider the manageability of the class and the fairness to Defendants. Due to the numerous different job titles and responsibilities, as well as the multiple defenses applicable to the individual Plaintiffs, we conclude that the fairness and procedural considerations weigh against a collective action."); *King v. West Corp.*, No. 8:04-

cv-318, 2006 WL 118577, at *15 (D.Neb. Jan. 13, 2006) ("Disparate individual defenses heighten the individuality of claims, and requiring the defendant to raise these arguments in a [collective] action suit undermines its ability to mount a clear and coherent defense to the case.").

Moreover, failure to allow Defendant to try individual defenses as to each Plaintiff would violate Defendant's due process rights because each Plaintiff's case requires consideration of different background facts and different testimony based on each Opt-In Plaintiff's particular project, work activities, location, compensation, and classification. *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 587-88 (E.D. La. 2008) (granting decertification motion because "serious concerns about due process" would be raised, and holding that "[the defendant] cannot be expected to come up with 'representative' proof when the plaintiffs cannot reasonably be said to be representative of each other"); *Robinson v. Dolgencorp*, No. 5:06-cv-122, 2006 WL 3360944 (M.D. Fla. Nov. 13, 2006).

Finally, viewed from the perspective of class manageability, the trial of the named Plaintiffs' claims would not necessarily resolve the claims of Opt-in Plaintiffs who held *different* positions, performed *different* job duties, worked on *different* projects, worked for *different* clients, or reported to *different* supervisors.

**Conclusion**             ...................................................................................................**45**

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Acs v. Detroit Edison Co.,*
444 F.3d 763, 768-70 (6th Cir. 2006) …………………………………………………20

*Akins v. Worley Catastrophe Response, LLC,*
No. 12-cv-2401, 2013 WL 1907486, at *3 (E.D. La. May 8, 2013)………………………....20, 21

*Ale v. Tenn. Valley Auth.,*
269 F.3d 680, 688-89 (6th Cir. 2001)………………………………………………………30

*Anderson v. Cagle's,*
488 F.3d 945, 954 n. 8 (11th Cir. 2007) ……………………………………………………...39

*Ayers v. SGS Control Servs., Inc.,*
No. 03 CIV. 9078 RMB, 2007 WL 646326, at *6 (S.D.N.Y. Feb. 27, 2007). …………………18

*Baden–Winterwood v. Life Time Fitness, Inc.,*
566 F.3d 618, 626-27 (6th Cir. 2009) …………………………………………………………20

*Bamgbose v. Delta-T Group, Inc.,*
684 F. Supp. 2d 660, (E.D. Pa. 2010) …………………………………………………………43

*Basco v. Wal-Mart Stores, Inc.,*
No. 00-3184, 2004 WL 1497709 (E.D. La. July 2, 2004)………………………………………39

*Beauperthuy v. 24 Hour Fitness USA, Inc.,*
772 F. Supp. 2d 1111, 1132-33 (N.D. Cal. 2011)……………………………………………..39

*Bradford v. CVS Pharmacy, Inc.,*
308 F.R.D. 696, 702 (N.D. Ga. 2015)…………………………………………………………34

*Brock v. On Shore Quality Control Specialists, Inc.,*
No. A-84-CA-603, 1987 WL 31308 (W.D. Tex. Sept. 29, 1987) ………………………32, 33, 34

*Cameron v. Abercrombie & Fitch Co.,,*
No. 2:10–cv–631, 2012 WL 4057240, at *3 (S.D. Ohio Sept. 14, 2012) ………………………20

*Campbell-Ewald Co. v. Gomez,*
136 S.Ct. 663 (2016) …………………………………………………………………………13

*Castle v. Wells Fargo Fin., Inc.,*
No. C–06–4347–SI, 2008 WL 495705, at *2 (N.D. Cal. Feb. 20, 2008) ………………………19

*Cornell v. World Wide Bus. Servs. Corp.,*
No. 2:14-CV-27, 2015 WL 6662919, at *2 (S.D. Ohio Nov. 2, 2015) ……………...18, 19, 28, 45

*Creely v. HCR ManorCare, Inc.,*
920 F. Supp. 2d 846, 852-53 (N.D. Ohio 2013). ……………………………………………29, 43

*Cruz v. Lawson Software, Inc.,*
764 F. Supp. 2d 1050, 1061-62 (D. Minn. 2011) …………………………………………………39

*Douglas v First Student, Inc.,*
888 F. Supp. 2d 936 (S.D. Iowa 2012). ……………………………………………………………40

*Espenscheid v DirectSat USA, LLC,*
No. 09-CV-625-BBC, 2011 WL 2009967 (W.D. Wis. May 23, 2011) ……………………..17, 18

*Evancho v. Sanofi-Aventis U.S. Inc.,*
No. 07-2266, 2007 WL 4546100, at *3 (D.N.J. Dec. 19, 2007) ………………………………...32

*Frye v. Baptist Mem'l Hosp.,*
No. CIV. 07-2708, 2010 WL 3862591, at *2 (W.D. Tenn. Sept. 27, 2010)……………..13, 17, 27

*Gatewood v. Koch Foods of Mississippi, LLC,*
No. 3:07-CV-00082 KS–MTP, 2009 WL 8642001, at *20 (S.D. Miss. Oct. 20, 2009) ………...40

*Glatt v. Fox Searchlight Pictures, Inc.,*
811 F.3d 528,539-40 (2nd Cir. 2015) …………………………………………………………...43

*Green v. Harbor Freight Tools USA, Inc.,*
88 F. Supp. 2d 1088, 1103 (D. Kan. 2012) ……………………………………………………...28

*Harriet v. Wal-Mart Stores, Inc.,*
No. 11-cv-2510-MLC, 2012 WL 2878078, *5 (D.N.J. July 13, 2012) …………………………43

Harrison v. Delguerico's Wrecking & Salvage, Inc.,
No. CV 13-5353, 2016 WL 826824, at *7 (E.D. Pa. Mar. 2, 2016) …………………………….41

*Harrison v. McDonald's Corp.,*
411 F. Supp. 2d 862, 865 (S.D. Ohio 2005) …………………………………………………….18

*Hendricks v. Total Quality Logistics, LLC,*
292 F.R.D. 529, 540 (S.D. Ohio 2013). …………………………………………………………38

*Holaway v. Stratasys, Inc.,*
No. 12-998, 2013 WL 5787476, at *3 (D. Minn. Oct. 28, 2013) ……………………………….39

*Holt v. Rite Aid Corp.,*
333 F. Supp. 2d 1265, 1272 (M.D. Ala. 2004) …………………………………………………43

*Hughes v. Gulf Interstate Field Services, Inc.*
2:14-cv-000432, 2016 WL 4197596 (S.D. Ohio Aug. 8, 2016)…..………………………....*passim*

*In re Morgan Stanley Smith Barney LLC Wage & Hour Litig,*
No. 11-cv-3121-WJM, 2016 WL 1407743, *5 (D.N.J. Apr. 11, 2016) …………………………43

*In re Tyson Foods, Inc.,*
694 F. Supp. 2d 1372, 1378 (M.D. Ga. 2010) ……………………………………………..27

*IntraComm, Inc. v. Bajaj,*
492 F.3d 285, 294 (4th Cir. 2007). ……………………………………………………...36

*Johnson v. Big Lots Stores, Inc.,*
561 F. Supp. 2d 567, 587-88 (E.D. La. 2008)…………………………………………………6, 41

*Jones-Turner v. Yellow Enterprise Sys., LLC,*
597 F. App'x 293, 298 (6th Cir. 2015) ……………………………………………………26

*King v. West Corp.,*
No. 8:04-cv-318, 2006 WL 118577, at *15 (D.Neb. Jan. 13, 2006) ………………………..39, 41

*Kuznyetsov v. W. Penn Allegheny Health Sys., Inc.,*
No. 10-948, 2011 WL 6372852, at *7 (W.D. Pa. Dec. 20, 2011) ………………………………28

*Levine v. Unity Health Sys.,*
847 F. Supp. 2d 507, 509-10 (W.D.N.Y. 2012) ……………………………………………20

*Lipnicki v. Meritage Homes Corp.,*
No. 3:10-CV-605, 2014 WL 5620603, at *3 (S.D. Tex. Nov. 4, 2014) ……………………….. 29

*Lusardi v. Xerox Corp.,*
110 F.R.D. 351, 360 (D.N.J. 1987) …………………………………………………………...40

*Martin v. Citizens Fin. Grp., Inc.,*
No. 10-260, 2013 WL 1234081, at *3 (E.D. Pa. Mar. 27, 2013)…….………………………… 18

*Martinez v. Hilton Hotels Corp.,*
930 F. Supp. 2d 508, 523 (S.D.N.Y. 2013) ………………………………………………..20

*McDonald v. Gulf Interstate Field Servs., Inc.,*
No. 2:14-CV-432, 2017 WL 462249, at *1 (S.D. Ohio Jan. 4, 2017) ………………………20, 22

*McPherson v. LEAM Drilling Systems, LLC,*
No. 4:14-CV-02361, 2015 WL 1470554 (S.D. Tex. Mar. 30, 2015) …………………………...39

*McReynolds v. Pocahontas Corp.,*
192 F.2d 301, 303 (4th Cir. 1951) …………………………………………………………20

*Mike v. Safeco Ins. Co. of Am.,*
274 F. Supp. 2d 216, 220 (D. Conn. 2003) …………………………………………………...34

*Mitchell v. Abercrombie & Fitch, Co.,*
428 F. Supp. 2d 725, 744 (S.D. Ohio 2006). …………………………………………………35

*Monroe v. FTS USA, LLC,*
763 F. Supp. 2d 979, 994 (W.D. Tenn. 2011)) …………………………………………….…19

*Morisky v. Public Serv. Elec. And Gas Co.,*
111 F. Supp. 2d 493, 498…………………………………………………………………...32

*Nobles v. State Farm Mut. Auto. Ins. Co.,*
No. 2:10-cv-4175, 2013 WL 12153518, at *11 (W.D. Mo. July 8, 2013) …………………17, 18

*O'Brien v. Ed Donnelly Enters.,*
575 F.3d 567, 584 (6th Cir. 2009) ………………………………………………...13, 17, 18, 26

*O'Dell v. Alyseka Pipeline Serv. Co.,*
856 F.2d 1452 (9th Cir. 1988) ……………………………………………………………33, 34

*Olivo v. GMAC Mortg. Co.,*
374 F. Supp. 2d 545 (E.D. Mich. 2004) ……………………………………………………30

Orton v. Johnny's Lunch Franchise,
668 F.3d 843, 847-48 (6th Cir. 2012)…………………………………………………*passim*

*Rindfleisch v. Gentiva Health Servs., Inc.,*
22 F. Supp. 3d 1295, 1303 (N.D. Ga. 2014) ………………………………………………25

*Rivera v. Anjost Corp.,*
No. 15-2143, 2016 WL 1274182, at * 1-2 (2nd Cir. Apr. 1, 2016) …………………………..21

*Robinson v. Dolgencorp,*
No. 5:06-cv-122, 2006 WL 3360944 (M.D. Fla. Nov. 13, 2006). ………………………….41

*Sargent v. HG Staffing, LLC,*
171 F. Supp. 3d 1063, 1079 (D. Nev. 2016). …………………………………….19, 27, 40

*Schaefer v. Indiana Michigan Power Co.*,
358 F.3d 394, 402 (6th Cir. 2004) …………………………………………………………………33

*Simons v. Pryor's, Inc.*,
No. 3:11-CV-0792-CMC, 2011 WL 3158724, at *9 (D.S.C. July 26, 2011)……………………27

*Sloane v. Gulf Interstate Field Services, Inc.*
4:16-cv-01571, 2017 WL 1105236 (M.D. Penn. March 24, 2017) ………………………..*passim*

*Smith v. Frac Tech Servs., LLC*,
No. 4:09CV00679 JLH, 2011 WL 96868, at *18 (E.D. Ark. Jan. 11, 2011) ………………18, 34

*Smith v. Heartland Auto. Servs., Inc.*,
404 F. Supp. 2d 1144, 1152 (D. Minn. 2005)……………………………………………………35

*Smith v. Johnson & Johnson*,
593 F.3d 280, 283 n.l, 285 (3d Cir. 2010)………………………………………………………30

*Smith v. Micron Electronics, Inc.*,
No. CV–01–244–S–BLW, 2005 WL 5336571, at *2 (D. Idaho Feb. 4, 2005) …………………19

*Snelling v. ATC Healthcare Servs. Inc.*,
No. 2:11-CV-00983, 2012 WL 6042839, at *2 (S.D. Ohio Dec. 4, 2012) ………………….…17

*Snipes v. Northeast Pharms., Inc.*,
No. 2:11-cv-1000-SRW, 2013 WL 757628, at *7 (M.D. Ala. Feb. 27, 2013) ………………… 21

*Soderberg v. Naturescape, Inc.*,
No. 10-3429, 2011 WL 11528148, at *11 (D. Minn. Nov. 3, 2011) …………………………39

*Swigart v. Fifth Third Bank*,
276 F.R.D. 210, 213 (S.D. Ohio 2011). ……………………………………………………………17

*Villanueva-Bazaldua v. TruGreen Ltd. Partners*,
479 F. Supp. 2d 411, 416 (D. Del. 2007) ……………………………………………………..43

*White v. Baptist Mem. Health Care Corp.*,
No. 08-2478, 2011 WL 1883959, at *5 (W.D. Tenn. May 17, 2011) …………………………..26

*White v. Baptist Mem'l Health Care Corp.*,
699 F.3d 869, 878 (6th Cir. 2012) ………………………………………………………………26

*Willoughby v. Youth Villages, Inc.*,
113 F. Supp. 3d 1265, 1275 (N.D. Ga. 2015)……………………………………………………25

*Zavala v. Wal Mart Stores Inc.,*
691 F.3d 527, 538 (3rd Cir. 2012) ……………………………………………………18

**Regulations**

29 C.F.R. § 541.100(a)……………………………………………………………...35

29 C.F.R. § 541.102(b)…………………………………………………………36, 45

29 C.F.R. § 541.200(a)……………………………………………………………33, 35

29 C.F.R. § 541.201(a)……………………………………………………………33

29 C.F.R. § 541.201(a)-(b) ……………………………………………………44

29 C.F.R. § 541.203(g), (j) ……………………………………………………35

29 C.F.R. § 541.600(a) …………………………………………………………45

29 C.F.R. § 541.601(c) …………………………………………………………38

29 C.F.R. §541.602……………………………………………………………....27

29 C.F.R. § 541.602(a) ………………………………………………………20

29 C.F.R. § 541.603……………………………………………………………...21

29 C.F.R. § 541.701……………………………………………………………...45

29 C.F.R. § 541.708……………………………………………………………...37

29 C.F.R. § 602(a)(1), (b)(1) …………………………………………………27

**Statutes**

29 U.S.C. § 213……………………………………………………………….....45

29 U.S.C. § 216(b) …………………………………………………………….29

## OVERVIEW

Plaintiffs bring this Fair Labor Standards Act ("FLSA") case on behalf of a putative class comprised of pipeline inspectors; this case is premised on the allegation that they were paid a non-salary day rate, which improperly excluded overtime pay.  After limited discovery, the Court conditionally certified a class consisting of:

> All current and former employees of [Wood Group Mustang] who were classified with the pay code "DAY – Non Exempt Day Rate," and who worked in Wood Group Mustang's Pipeline Services Inspection Department as an inspector (or an equivalent position) in the United States in any workweek between three years prior to the date of the Court's Order and the present.[1]

WGM now moves to decertify the class.

To maintain this action as a collective action and to survive WGM's Decertification Motion, Plaintiffs must prove that all 93[2] Opt-In Plaintiffs are "similarly situated."[3]  Following extensive discovery, Plaintiffs cannot prove they are similarly situated, and their attempt to bring this case as a collective action fails.  This action should be decertified for the following reasons:

(1)    While Plaintiffs were paid a day rate, they were guaranteed being paid 5, 6, or 7 days a week ("weekly day rate guarantee"), depending upon the particular customer contract they were working under, regardless of whether they worked the guaranteed number of days or not.  DOL regulations recognize that a day or piece rate with a guarantee meets the salary basis test for FLSA exemptions.  As a result, the Plaintiffs were paid on a salary basis, and Plaintiffs' cornerstone argument that all Plaintiffs are similarly situated based on Defendant's use of a day rate is meritless;

(2)    The 93 Opt-In Plaintiffs worked on more than 130 customer projects.  The rate of pay, number of guaranteed days, and how the guarantee was applied and

---

[1]    Doc. No. 54, at p. 13.

[2]    WGM maintains that the claims of 24 opt-in Plaintiffs are subject to dismissal based on the following: fourteen (14) Plaintiffs on statute of limitations grounds; eight (8) Plaintiffs for refusal to participate in discovery; and two (2) Plaintiffs because they did not work for WGM as an inspector or equivalent position.

[3]    "To avoid decertification, the named plaintiffs must introduce 'substantial evidence' that the opt-in plaintiffs are similarly situated."  *Frye* v. *Baptist Mem'l Hosp.*, No. CIV. 07-2708, 2010 WL 3862591, at *2 (W.D. Tenn. Sept. 27, 2010) (internal citations omitted), *aff'd sub nom.*, 495 F. App'x 669 (6th Cir. 2012); *O'Brien* v. *Ed Donnelly Enters.*, 575 F.3d 567, 584 (6th Cir. 2009), abrogated in part on other grounds by *Campbell-Ewald Co.* v. *Gomez*, 136 S.Ct. 663 (2016) ("[t]he lead plaintiffs bear the burden of showing that the opt-in plaintiffs are similarly situated to the lead plaintiffs").

interpreted all depended upon the client contract and customer project manager the WGM employee was working under on a particular project;

(3)    Plaintiffs are not similarly situated because several Opt-In Plaintiffs always received their weekly day rate guarantee and did not suffer any damages;

(4)    Any instance in which a Plaintiff did not receive their full weekly day rate guarantee did not occur based on a common practice and requires individualized analysis on a project by project, opt-in by opt-in basis to determine whether the deduction was in violation of the FLSA;

(5)    Because Plaintiffs were paid on a salary basis, it will be necessary to determine each Plaintiff's eligibility for exempt status from overtime based on their individual duties and level of compensation pursuant to the executive, administrative, highly compensated, and combination exemptions under the FLSA on a project by project basis.  In that regard, as discussed herein, significant factual disparities exist among the Plaintiffs, which demonstrates the need for decertification;

(6)    Individualized inquiries as to the applicability of the overtime exemptions, or as to whether any Plaintiffs were not compensated on a salary basis, overwhelm any attempt to label the Plaintiffs as "similarly situated," and thus collective resolution is not feasible; and

(7)    Consideration of fairness and manageability support decertification dismissal.

## SUMMARY OF THE ARGUMENT

The legally significant differences between each of the Plaintiff's claims, the evidence required to prove those claims, and WGM's defenses all outweigh the Plaintiffs' generalizations of their claim for class certification, and render the Plaintiffs unable to prove that they are similarly situated in order to maintain class certification.  The recent cases of *Hughes v. Gulf Interstate Field Services, Inc.* and *Sloane v. Gulf Interstate Field Services, Inc.* are factually and legally similar to the claims in this case and support the only conclusion that in this case, decertification is required.

Like here, the plaintiffs in *Sloane v. Gulf Interstate Field Services, Inc.*[4] brought suit against a company that supplied inspectors to pipeline companies and sought certification of a collective action of a nationwide group of Chief Inspectors, Assistant Chief Inspectors, Welding Inspectors, Environmental Inspectors, Utility Inspectors and Coating Inspectors, each with different qualifications, different expertise and different job duties.[5]  In *Sloane*, the plaintiffs likewise contended they were paid a day-rate, and the employer, Gulf Interstate, failed to compensate the claimants for overtime pay.

The court in *Sloane* analyzed the significant evidence regarding the inspectors' pay, job duties, and assignments, and held that

> [n]umerous features of this litigation are fatal to the class's success: (1) significant disparities exist among the putative class members, their worksites, their responsibilities, and their clients -- there is no common thread; (2) individualized inquiries as to the applicability of certain exemptions would overwhelm collective resolution; (3) applicable payroll records reveal that they were likely paid a salary, and (4) the [rate sheets regarding pay] are at worst ambiguous and at best clarify that the workers actually received a salary guarantee.[6]

The court further held that it was not the written document of the payment policies that were relevant to the salary-basis test, but rather the actual payment practice.[7]  The court found that even though there was a similarity in job titles, the job duties were different from project to project, client to client, location to location.[8]  Inspectors also exercised various levels of discretion and independent judgment.[9]  The employer, Gulf Interstate, staffed a project based on the needs of the individual client, and the project direction as determined by the individual client, who controlled the inspector's work schedule, closure of the project, leaves, and pay for leaves.[10]

---

[4]      4:16-cv-01571, 2017 WL 1105236 (M.D. Penn. March 24, 2017) (hereinafter "*Sloane*").
[5]      *Sloane* at *2, *11.
[6]      *Id.* at *1.
[7]      *Id.* at *3.
[8]      *Id.* at *2.
[9]      *Id.*
[10]     *Id.*

Further, because the members of the putative class were so diverse, the court held that resolution of the employer's exemption defenses (highly compensated, executive, and administrative) would require significant individualized factfinding precluding certification.[11]  In addition, because the evidence established that the plaintiffs were paid for days not worked, *i.e.*, paid for holidays not worked like July 4th, was "[h]ighly problematic" for the plaintiffs, as a day away from work without a reduction in the salary supported the employer's defense the plaintiffs were paid on a salary basis, *i.e.,* a weekly guarantee based on a day-rate.[12]

In *Hughes v. Gulf Interstate Field Services, Inc.*,[13] the plaintiffs also brought a collective action against the employer, Gulf Interstate, on behalf of pipeline inspectors seeking overtime pay due to the employer's policy to pay a weekly guarantee based on a day-rate.  Gulf Interstate was granted summary judgment on the basis of the (1) administrative, and (2) highly compensated exemptions.  The court held that the evidence supported the employer's position that the inspectors were paid on a salary basis, *i.e.*, time sheets showed the plaintiffs were paid a 6-day day-rate guarantee, less lawful deductions.[14]

The facts of this case are on all four points with *Sloane* and *Hughes:* pipeline inspectors paid on a weekly day-rate guarantee who are exempt from the overtime requirements of the FLSA.  As is further borne out by the deposition testimony of approximately 13% of the proposed class (12 of 93 Plaintiffs were deposed), along with other evidence, the facts plainly show that the Plaintiffs are not similarly situated because they cannot show that a common policy or practice violated the FLSA with respect to each of them.  They do not allege common

---

[11]     *Id.* at *13-16.
[12]     *Id.* at *18.
[13]     2:14-cv-000432, 2016 WL 4197596 (S.D. Ohio Aug. 8, 2016) (hereinafter *"Hughes"*)
[14]     *Hughes* at *3.

facts or circumstances giving rise to their claims, and their claims are subject to myriad individualized defenses, all of which renders this case unmanageable as a collective action.[15]

Accordingly, collective treatment of the Plaintiffs' claims is simply not feasible. For these reasons, and those more fully explained herein, WGM respectfully requests that the Court decertify the conditionally-certified collective action and dismiss the Opt-In Plaintiffs' claims without prejudice.

## LEGAL STANDARD FOR DECERTIFICATION

"[T]he Sixth Circuit has implicitly upheld a two-step procedure for determining whether an FLSA case should proceed as a collective action."[16] "First, in what is referred to as the initial notice stage, the Court must determine whether to conditionally certify the collective class and whether notice of the lawsuit should be given to putative class members."[17] "At the second stage of the proceedings, the defendant may file a motion to decertify the class if appropriate to do so based on the individualized nature of the plaintiff's claims."[18]

On a defendant's motion for decertification, "[t]he lead plaintiffs bear the burden of showing that the opt-in plaintiffs are similarly situated to the lead plaintiffs."[19] "To avoid decertification, the named plaintiffs must introduce 'substantial evidence' that the opt-in plaintiffs are similarly situated."[20] Plaintiffs must meet their burden through admissible

---

[15]    Courts have decertified classes in which the plaintiff showed that the putative class members "are bound by a uniform time keeping policy," and "perform similar job duties" where "the evidence [nevertheless] shows that opt-in plaintiffs and class members have different work experiences . . . " *Nobles v. State Farm Mut. Auto. Ins. Co.*, No. 2:10-cv-4175, 2013 WL 12153518, at *11 (W.D. Mo. July 8, 2013) (citing *Espenscheid v DirectSat USA, LLC*, No. 09-CV-625-BBC, 2011 WL 2009967 (W.D. Wis. May 23, 2011), *amended*, No. 09-CV-625-BBC, 2011 WL 2132975, *aff'd* 705 F.3d 770 (7th Cir. 2013).
[16]    *Snelling v. ATC Healthcare Servs. Inc.*, No. 2:11-CV-00983, 2012 WL 6042839, at *2 (S.D. Ohio Dec. 4, 2012).
[17]    *Swigart v. Fifth Third Bank*, 276 F.R.D. 210, 213 (S.D. Ohio 2011).
[18]    *Id.*
[19]    *O'Brien*, 575 F.3d at 584.
[20]    *Frye*, 2010 WL 3862591, at *2.

evidence.[21]  "Second-stage review is understandably more stringent as it occurs after discovery has been completed."[22]

It is well established that "certification is not proper where the defendant, in defending against the collective claims, 'would be required to pick the class apart, plaintiff by plaintiff . . . .' [citation omitted]  Such an undertaking 'is tantamount to conducting multiple individual trials on the merits and is the antithesis of a collective action.'"[23]

In addition, the FLSA does not allow for collective treatment of disparate claims and efficiency cannot be had at the expense of due process.[24]  In analyzing fairness and procedural considerations, the Court must therefore consider potential prejudice to *both* parties.[25]  Further, "general allegations of an overarching employer policy 'are insufficient, and plaintiffs are required to produce substantial evidence of a single decision, policy, or plan.'"[26]

> The Fair Labor Standards Act does not define 'similarly situated,' and neither has this court [the Sixth Circuit Court of Appeals].  However, district courts have based their final-certification decisions on a variety of factors, including the factual and employment settings of the individual plaintiffs, the different defenses to which the plaintiffs may be subject on an individual basis, and the degree of fairness and procedural impact of certifying the action as a collective action.[27]

One district court within the Southern District of Ohio recently distilled the decertification inquiry to be "whether the differences among the Plaintiffs outweigh the similarities of the

---

[21]     *See, e.g.*, *Harrison v. McDonald's Corp.*, 411 F. Supp. 2d 862, 865 (S.D. Ohio 2005) ("Courts . . . have repeatedly held that only admissible evidence may be considered in connection with a § 216(b) motion.").
[22]     *Cornell v. World Wide Bus. Servs. Corp.*, No. 2:14-CV-27, 2015 WL 6662919, at *2 (S.D. Ohio Nov. 2, 2015).
[23]     *Nobles*, 2013 WL 12153518, at *11 (*citing Espenscheid*, 2011 WL 2009967, at *7).
[24]     *See Smith v. Frac Tech Servs., LLC*, No. 4:09CV00679 JLH, 2011 WL 96868, at *18 (E.D. Ark. Jan. 11, 2011) ("Were this case to go to trial as a class action, the risk would be great that some supervisors with meritorious claims would be prejudiced by being joined in a class with service supervisors who do not have meritorious claims.").
[25]     *Ayers v. SGS Control Servs., Inc.,* No. 03 CIV. 9078 RMB, 2007 WL 646326, at *6 (S.D.N.Y. Feb. 27, 2007).
[26]     *Sloane* at *11; *Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 538 (3rd Cir. 2012); *Martin v.Citizens Fin. Grp., Inc.,* No. 10-260, 2013 WL 1234081, at *3 (E.D. Pa. Mar. 27, 2013).
[27]     *O'Brien*, 575 F.3d at 584.  WGM addresses all three of these factors herein.

18

practices to which they were allegedly subjected."[28]   It is not sufficient for the plaintiffs'
evidence to merely "successfully engage" the competing evidence offered by the defendant,
rather, it is plaintiffs' burden to provide substantial evidence to demonstrate that they are
similarly situated.[29]

## ARGUMENT AND AUTHORITIES

I.  **PLAINTIFFS FAIL TO MEET THEIR BURDEN OF PROOF THAT THEY ARE
    SIMILARLY SITUATED**

   A.   **Plaintiffs Are Not Similarly Situated Based on a Common Policy or Plan Due
        To Defendant's Use of a Guaranteed Weekly Salary Based on a Day Rate.**

To obtain conditional certification, Plaintiffs claimed that the WGM's practice of paying
a day rate failed to satisfy the salary basis test.  As demonstrated below, the record evidence
establishes that on a project by project basis, Defendant had a guaranteed weekly day rate which
compensated Plaintiffs a specified number of days (5-7) a week regardless of whether such days
were worked by Plaintiffs or not.  Such a practice satisfies the salary basis test.  As a result,
Plaintiffs cannot claim that Defendant's payment of the day rate represents a single FLSA-
violating policy from which Plaintiffs suffered.[30]

The salary basis test is satisfied when an "employee regularly receives each pay period
on a weekly, or less frequent basis, a predetermined amount constituting all of part of the
employee's compensation, which amount is not subject to reduction because of variations in the
quality or quantity of the work performed."[31] The Sixth Circuit has confirmed that an
employer's actual pay practices need not be evidenced by an employment agreement or formal

---

[28]     *Cornell*, 2015 WL 6662919, at *2 (quoting *Monroe v. FTS USA, LLC*, 763 F. Supp. 2d 979, 994 (W.D.
Tenn. 2011)).
[29]     *Castle v. Wells Fargo Fin., Inc.*, No. C–06–4347–SI, 2008 WL 495705, at *2 (N.D. Cal. Feb. 20, 2008);
*Smith v. Micron Electronics, Inc.*, No. CV–01–244–S–BLW, 2005 WL 5336571, at *2 (D. Idaho Feb. 4, 2005);
*Sargent v. HG Staffing, LLC*, 171 F. Supp. 3d 1063, 1079 (D. Nev. 2016).
[30]     *Sloane* at *17.
[31]     29 C.F.R. § 541.602(a); *Orton*, 668 F.3d at 847-48.

policy to establish that an employee is paid a predetermined amount satisfying the salary basis test.[32] "[I]t has long been clear that an employer may satisfy the salary-basis test even though it chooses to pay salaried employees on an hourly basis," so too may an employer satisfy the salary basis test by paying an employee a predetermined guaranteed amount of weekly pay derived from a daily rate, multiplied by a number of days or shifts per week: "Any formula which results in [] a guarantee is sufficient."[33] Any suggestion otherwise was squarely refuted in *Orton*, where the Sixth Circuit held that the salary basis test "focuses on pay received, rather than the terms of [any] employment agreement" or policy.[34] Accordingly, the "predetermined amount" element of the salary basis test is proven by an employer's *actual pay practices* and not by any written

---

[32]    *Hughes* at *4.

[33]    *ACS v. Detroit Edison Co.*, 444 F.3d 763, 768-70 (6th Cir. 2006); *McReynolds v. Pocahontas Corp.*, 192 F.2d 301, 303 (4th Cir. 1951) (holding that employees paid based on a minimum guarantee of three shifts per week, with a fixed pay rate per shift, as was custom in the coal industry, satisfied the salary basis test); *Cameron v. Abercrombie & Fitch Co.,*, No. 2:10–cv–631, 2012 WL 4057240, at *3 (S.D. Ohio Sept. 14, 2012). In addition, any reference to being paid by the "day" or to a "Day Rate" regarding the Plaintiffs is not relevant, given the fact that WGM actually paid the Plaintiffs the agreed-upon set amount each week. *See, e.g., Orton v. Johnny's Lunch Franchise*, 668 F.3d 843, 847-48 (6th Cir. 2012) (holding that salary basis test "focuses on pay received, rather than the terms of [any] employment agreement" or policy); *Sloane*, 2017 WL 1105236, at *17 ("Just because a salary is expressed as a guaranteed amount per day does not mean that it is no longer a salary . . ."); *McDonald v. Gulf Interstate Field Servs., Inc.*, No. 2:14-CV-432, 2017 WL 462249, at *1 (S.D. Ohio Jan. 4, 2017); *Akins v. Worley Catastrophe Response, LLC*, No. 12-cv-2401, 2013 WL 1907486, at *3 (E.D. La. May 8, 2013) ("The regulations do not require that the wages be called a 'salary' to qualify as being paid on a 'salary basis.'"); *Levine v. Unity Health Sys.*, 847 F. Supp. 2d 507, 509-10 (W.D.N.Y. 2012) (holding that plaintiffs were paid on a salary basis and that "[d]espite the employer's use of potentially confusing references to an 'hourly rate' in its payroll statements to the plaintiffs, the focus of the FLSA, and this Court's inquiry, is whether the plaintiffs were actually paid on a salary or hourly basis, and not how they may have interpreted their employer's contemporaneous use of 'salary' and 'hours' terminology," and holding that the undisputed pay records showed that plaintiffs were paid on a salary basis as a matter of law); *Martinez v. Hilton Hotels Corp.*, 930 F. Supp. 2d 508, 523 (S.D.N.Y. 2013) ("[C]ourts generally have rejected the proposition that an employer's reference to hourly rates in payroll statements affects an employee's status as a salaried employee.").

[34]    *Orton*, 668 F.3d at 847, 848 n.4; see *Hughes* at *4 ("It is not written descriptors of the payment policies that are relevant to the salary-basis test inquiry, but rather the actual payment practice."); *Cameron*, 2012 WL 4057240, at *3 (entering summary judgment for an employer based upon the administrative exemption and finding the salary basis test satisfied based solely upon the employee's pay stubs showing the manner in which the employee was in fact paid); *ACS*, 444 F.3d at 770. In addition, the 2004 amendments to the salary basis test, specifically the adoption of 29 C.F.R. § 541.603, abrogated all prior precedents that the salary basis test failed merely where an employee was compensated under a policy communicating a significant likelihood of improper deductions, even where the employee did not suffer any such improper deductions. *Baden–Winterwood v. Life Time Fitness, Inc.*, 566 F.3d 618, 626-27 (6th Cir. 2009).

descriptors of the payment policies such as those trumpeted here by Plaintiffs and included in the class definition, and a salary calculated on a daily basis is nevertheless a salary.[35]

As in *Sloane*, an employee is considered paid on a salary basis within the meaning of the FLSA not based upon what is stated in an employment agreement or contract, but rather what is actually received by the plaintiffs.[36]  "Highly problematic for [the plaintiffs] are the existence of days upon which the claimants were not at work but were nevertheless paid the same fixed salary."[37]

> It is well settled that an employee's earnings may be computed on a daily basis without violating the salary-basis requirement, but only if : (1) the employment arrangement includes a guarantee of the minimum weekly amount of $455 paid irrespective of the number of days worked; and (2) "a reasonable relationship exists between the guaranteed amount and the amount actually earned."[38]

During the negotiation of the contracts that WGM entered into with its various oil and gas company customers, a weekly day rate guarantee for WGM's Inspectors was determined between WGM and the customer and was included the contract's rate sheet.[39]  WGM paid the Opt-In Plaintiffs a day rate which, depending on the project, had a guarantee of either five, six,

---

[35]     As noted above, the class definition here is overbroad on its face because it relies on a pay policy description the Sixth Circuit has explicitly held has no effect on whether an employee is paid on a salary basis.  For instance, in *Snipes* v. *Northeast Pharms., Inc.,* No. 2:11-cv-1000-SRW, 2013 WL 757628, at *7 (M.D. Ala. Feb. 27, 2013), the district court granted summary judgment to a defendant that had (1) computed the plaintiffs salary on an hourly basis and (2) paid a guaranteed minimum each week.  The facts of the instant case are identical to *Snipes* in all relevant respects, with the only difference being that WGM computed the Plaintiffs' salaries on a daily, rather than hourly, basis.  Both methods are expressly allowed by FLSA regulations.  *Rivera* v. *Anjost Corp.,* No. 15-2143, 2016 WL 1274182, at * 1-2 (2nd Cir. Apr. 1, 2016), is also instructive.  In *Rivera*, the Second Circuit noted that the plaintiff "always received regular weekly compensation for five days (or less) of work per week [and] introduced no evidence that he ever received less than that standard weekly amount."  *Id.* at *l-2.  Another instructive case is *Akins* v. *Worley Catastrophe Response, LLC,* .  In *Akins,* the court rejected the plaintiffs' argument that they were paid a "day rate" because their salary was computed on a daily basis, noting that the FLSA regulations expressly allowed for the daily computation of a salary.  2013 WL 1907486, at *4.

[36]     *Sloane* at *18.

[37]     *Id.*

[38]     *Hughes* at *3 (*citing* 29 C.F.R. §541.604(b)).

[39]     Exh. 5, Gust Decl., ¶¶ 3-5, 7-9, and Exhibits 1 and 2, thereto; Deposition of Andy Gust, attached hereto as Exhibit  12 at pp. 66-67; Exh. 9, Karl Dep., at p. 23.  Even though WGM's customer contracts always contain a salary guarantee for WGM's Inspectors, on one occasion an Inspector, opt-in plaintiff Lewis Whitmire, was involved in an outlier situation where he was actually paid by the day. Exh. 5, Gust Decl., ¶ 6.  WGM is not aware of any other instances of a WGM inspector being actually paid by the day.  *Id.*

or seven days a week whether they worked the guaranteed days or not.  In fact, a large majority of the Plaintiffs who were deposed admitted to being told of the particular salary guarantee at the beginning of each project.[40]  The Plaintiffs were then actually paid on a salary basis, and many Plaintiffs admitted to receiving their six or seven day salary guarantee during their employment regardless of the number of days actually worked.[41]

In *Hughes*, the plaintiffs were found to have been paid a guaranteed weekly day rate of six days, and in *Sloane*, the factual inquiry as to whether each plaintiff was paid a guaranteed weekly day rate supported decertification.  In this case, the above evidence of Plaintiffs being paid on a salary basis easily overcomes Defendant's underline internal on-boarding documents which, unbeknownst to Plaintiffs, inaccurately characterized Plaintiffs with the pay code "Day – Non Exempt Day Rate," and such documentation is not determinative of whether Plaintiffs were actually paid on a salary basis.[42]  Additionally, certain Plaintiffs confirmed through deposition testimony that they were paid for unworked holidays or other days such as personal days off on their particular projects, thereby further evincing the salary guarantee.[43]

---

[40]    Exh. 6, Moore Decl., ¶¶ 16, 18; Exh. 7, Finke Decl., ¶ 4; Exh. 8, Phillips Decl., ¶ 4; Deposition of Ashley Zammit, attached hereto as Exhibit 11, at pp. 13-14, 74-77; Exh. 12, Gust Dep. at p. 72; Exh. 10, Long Dep., at p. 12 (seven day guarantee); Deposition of Victor Menor, attached hereto as Exhibit 13, at pp. 24-25 (seven days salary); Deposition of Christopher Hoth, attached hereto as Exhibit 14, at pp. 10-11 (seven day guarantee); Deposition of Thomas Godwin, attached hereto as Exhibit 15, at pp. 21-22 (six day guarantee); Deposition of Louis Hollier, attached hereto as Exhibit 16, at pp. 22-23 (six or seven day guarantee); Exh. 9, Karl Dep., at pp. 16, 18-19 (seven day guarantee); Deposition of Roy Mullett, attached hereto as Exhibit 17, at p. 19 (seven day guarantee); *but see* Exh. 2, Tagarook Dep., at p. 39 (no salary guarantee); Exh. 4, Whitmire Dep., at pp. 20-21 (no salary guarantee); Deposition of William Overton, attached hereto as Exhibit 18, at p. 27 (no salary guarantee); Deposition of Richard Ashley, attached hereto as Exhibit 24, at p. 12 (no salary guarantee).

[41]    Exh. 6, Moore Decl., ¶¶ 16-18; Exh. 7, Finke Decl., ¶¶ 17, 18; Exh. 8, Phillips Decl., ¶ 4; Deposition of Debbie Archer, attached hereto as Exhibit 19, at pp. 89-91; Deposition of Mark Nussbaum, attached hereto as Exhibit 20, at pp. 34, 39; Exh. 12, Gust Dep., at pp. 64-66, 73-4, 83; Exh. 10, Long Dep., at pp. 47-48; Exh. 14, Hoth Dep., at pp. 11, 35-36; Exh. 15, Godwin Dep., at pp. 21-24; Exh. 9, Karl Dep., at p. 16; Exh. 17, Mullett Dep., at p. 29.

[42]    *Sloane* at *18 ("whether an employee is paid on a salary basis is determined by the compensation actually received, and not what is stated in an employment agreement") (citing *McDonald,* 2017 WL 462249, at *1 and *Orton,* 668 F.3d at 847-48).

[43]    Exh. 6, Moore Decl., ¶ 19; Exh. 7, Finke Decl., at ¶ 18; Exh. 8, Phillips Decl., ¶ 17; Exh. 19, Archer Dep., at pp. 99-100; Deposition of James Clark, attached as Exhibit 21, at p. 48 (worked five days during Thanksgiving week but was paid for six days, which was his guaranteed amount of days per week); Exh. 15, Godwin Dep., at pp.

The payroll records of Opt-In Plaintiffs James DeForrest, Daniel Kuhns, Norman Denton, and Frank Sargent, among others, show that WGM paid each of them a guaranteed salary each week throughout their entire employment with WGM regardless of the number of days they actually worked. The records plainly demonstrate they were paid their weekly day rate guarantee throughout their employment and that there were no weeks in which any improper deductions were made.[44]

The *Sloane* and *Hughes* courts dealt with this very issue under nearly-identical facts and found that the salary basis test was satisfied.[45] In *Sloane*, the plaintiffs, made the <u>precise</u> arguments that they are making in this case, using the same type of evidence, with an <u>identically-situated</u> group of plaintiffs (a variety of pipeline inspectors in a putative nationwide class). The plaintiffs in that case argued that any salary guarantee was "phantom" and that the plaintiffs' offer letters evinced solely a day rate of payment (similar to the descriptors in onboarding documents Plaintiffs have trumpeted in this case), not a salary guarantee. The *Sloane* court held, however, that even conditional certification was not warranted based upon the salary basis argument because, among other reasons, the employees received a pay guarantee and "[h]ighly problematic for Plaintiffs are the existence of days upon which the claimants were not at work but were nevertheless paid . . . ."[46] The facts in this case are <u>identical</u> - the majority of Plaintiffs who were deposed admitted to being told of a salary guarantee before they began work and to

---

21-22 (paid in accordance with guarantee for days out sick with kidney infection); Exh. 16, Hollier Dep., at pp. 43-56 (paid for days when performed no work); Exh. 9, Karl Dep., at pp. 18-19 (paid for rain out days), at pp. 45-46 (paid for personal days); Exh. 17, Mullett Dep., at pp. 29, 37 (paid for Thanksgiving but performed no work); Deposition of Laurie Popeck, attached hereto as Exhibit 22, at pp. 78-80 (paid for Labor Day and for personal day to attend wedding). As the *Sloane* court noted, the existence of days "upon which the claimants were not at work but were nevertheless paid" is **"highly problematic for Plaintiffs"** in making a salary basis argument. *Sloane* at *18 (emphasis added).

[44] *See* Declaration of Caroline Perez, attached hereto as Exhibit 3, ¶ 4 and Exhibits 1 and 2 thereto; Declaration of Ashley Zammit, attached hereto as Exhibit 25, ¶ 6 and Exhibit E thereto (providing list of opt-in Plaintiffs who were paid a guaranteed salary each week and who had no weeks in which any deductions were made).

[45] *Sloane* at *20; *Hughes* at *3-*4.

[46] *Sloane* at *18.

then being paid in accordance with that guarantee, including being paid for days when they performed <u>no</u> <u>work</u>, such as on holidays and personal days; to the extent that one or more Plaintiffs denied being told of a salary guarantee, that is the type of individualized issue that courts, including in the specific instance of pipeline inspectors, have held renders class certification and treatment inappropriate.[47]

Likewise, in *Hughes*, which also involved pipeline inspectors paid under a pay system consistent with the system WGM used to pay its inspectors, the Court relied on Sixth Circuit precedent and held that employment agreements, or written descriptors of pay practices, are not the relevant starting point for determining whether an employee is paid on a salary basis.[48] In *Hughes*, the plaintiffs argued that their offer letters (similar to the onboarding descriptors in this case but perhaps giving the *Hughes* plaintiffs a stronger argument than is present in this case given that those documents were offer letters and were provided to plaintiffs, as opposed to being internal-use only onboarding documents as is the case here), as well as some email traffic from members of management (similar to Laura VanDyk's testimony in this case), that described pay plans for inspectors as "day or days worked only, rather than a minimum number of days," demonstrated that the plaintiffs were not guaranteed the weekly minimum amount.[49] The court quickly dispatched that argument.

> Fatal to Plaintiffs' argument is the fact that the Sixth Circuit has squarely held that 'employment agreements are no longer the relevant starting point for whether an employee is paid on a salary basis. The question is therefore not what [a plaintiff] was owed under his employment agreement; rather, the question is what compensation [the plaintiff] actually received.[50]

---

[47] *Id.* at *17-*20.
[48] *Hughes* at *4 (further holding that "[i]t is not written descriptors of the payment policies that are relevant to the salary-basis test inquiry, but rather the actual payment practice.").
[49] *Id.* at *3.
[50] *Id.* at *4.

The court then applied that same principle to the emails in which the defendant's payroll department head had characterized the plaintiffs' pay schedules as "salary as day worked," and another member of the defendant's management sent an email in which he stated that inspectors were "paid for days worked only."[51]  The court then held that, because the plaintiffs had a salary guarantee and had been paid in accordance with that guarantee, that plaintiffs had in fact been paid on a salary basis, as is the case here.[52]  The precise same ruling should be entered here because the pay system used by WGM is consistent with that used by the defendant in *Hughes*.

### B.    Plaintiffs Are Not Similarly Situated Because Several Opt-In Plaintiffs Always Received Their Weekly Day Rate Guarantee and Did Not Suffer Any Damages.

In the present case, Plaintiffs and Defendant agree that there are several Plaintiffs who always received their weekly day rate guarantee for their employment on any particular project(s).  Plaintiffs' expert confirmed that a significant percentage of the Plaintiffs were indisputably paid for six or seven days per week during their employment on any particular project(s), which comports with the testimony of several Plaintiffs that they were paid a salary guarantee of six or seven days per week.[53]  Similarly Defendant's pay records demonstrate nearly two-dozen Opt-In Plaintiffs always received their weekly day rate guarantees.[54]  As a

---

[51]    *Id.* This evidence is similar to the pay descriptors at issue in this case – involving an onboarding document.
[52]    *Id.*
[53]    *See* Deposition of Colleen Vallen, attached hereto as Exhibit 23, at pp. 57-58 (testifying that over 33% of the Opt-In Plaintiffs were indisputably paid six or seven days per week during their entire employment in accordance with their salary guarantee).
[54]    Exh. 25, Zammit Decl., ¶ 6, Exhibit D thereto.  *See also Rindfleisch v. Gentiva Health Servs., Inc.*, 22 F. Supp. 3d 1295, 1303 (N.D. Ga. 2014) (holding that "every Plaintiff has to actually be owed overtime compensation in a collective action solely seeking overtime damages," "[a] collective action is improper when actual liability cannot be established on a class-wide basis," and that as "a general rule, a group of opt-in plaintiffs cannot be similarly situated for purposes of a collective action when individual determinations regarding liability must be made."); *Willoughby v. Youth Villages, Inc.*, 113 F. Supp. 3d 1265, 1275 (N.D. Ga. 2015) (decertifying class because some plaintiffs suffered no damages).

result, such Opt-In Plaintiffs are not similarly situated to those Plaintiffs who claim they did not always receive their guarantee and were injured by Defendant's guaranteed day rate pay policy.[55]

### C. Plaintiffs Are Not Similarly Situated Because Any Claimed Violations of the Salary Basis Test Implicate Individualized Inquiries About the Reasons Why Any Particular Plaintiff Was Not Paid On Any Particular Day On Any Particular Project.

Plaintiffs' allegation that members of the putative collective class were not paid on a salary basis implicates individualized inquiries that far exceed any facts that bind and support Plaintiffs' claims.[56]  As noted earlier, the Opt-In Plaintiffs worked on one or more of over 100 projects combined.[57]  While the projects were subject to contracts with rate sheets, the customers and project management determined how days not worked covered by the weekly day rate guarantee would be addressed.[58]  On occasion, Plaintiffs were not always paid for days not worked on particular projects, whereas on other projects, they were paid for days they plainly did not work.[59]

In order to determine whether an occurrence constitutes a violation of the FLSA, an individualized analysis on a project by project basis is required in this case.  The Department of Labor regulations, specifically, 29 C.F.R. § 541.602, addresses when deductions do and do not

---

[55]     *See, e.g., O'Brien*, 575 F.3d at 586 ("[an opt-in plaintiff] is not similarly situated to the lead plaintiffs, because she failed to allege that she suffered from either unlawful practice [placed at issue by the named plaintiffs].") *Jones-Turner v. Yellow Enterprise Sys., LLC*, 597 F. App'x 293, 298 (6th Cir. 2015) ("[W]ithout a viable claim, lead plaintiffs cannot represent others whom they allege to be similarly situated."); *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 878 (6th Cir. 2012) ("a lead plaintiff cannot be similarly situated and represent opt-in plaintiffs without a viable claim") *White v. Baptist Mem. Health Care Corp.*, No. 08-2478, 2011 WL 1883959, at *5 (W.D. Tenn. May 17, 2011) (holding that named plaintiffs and opt-in plaintiffs all must have viable FLSA claims to be deemed similarly situated and proceed collectively under Section 216(b)).

[56]     For instance, of the 12 out of 93 Plaintiffs who were deposed, Plaintiffs Tagarook, Overton, and Whitmire were the sole Plaintiffs who denied having a salary guarantee. Exh. 2, Tagarook Dep., at p. 39; Exh. 18, Overton Dep., at p. 27; Exh. 4, Whitmire Dep., at pp. 20-21.  This testimony, however, demonstrates the inherent individualized nature of this inquiry because each of the 81 Plaintiffs who were not deposed will be required to testify as to whether they had a salary guarantee (as did the majority of the deponent Plaintiffs) or allege that they had no such guarantee (as did only three of the 12 deposed Plaintiffs).

[57]     Exh. 25, Zammit Decl., ¶ 8, Exhibit F thereto.

[58]     Exh. 5, Gust Decl., ¶¶ 5, 7-9 and Exhibits 1 and 2, thereto; Exh. 25, Zammit Decl., ¶ 5 and Exhibits A and B, thereto.

[59]     Exh. 25, Zammit Decl., ¶ 6, Exhibit E thereto; Exh. 5, Gust Decl., ¶¶ 8-9, Exhibit 2 thereto.

affect an employee's salaried status.  Under this regulation, deductions for personal time off and when no work was performed is permissible and does not affect salaried status.[60]  In this case, the evidence reflects that individuals had personal days and weeks in which no work was performed though in some cases, the project continued to operate on those days.[61]

On some projects, the customer authorized for Plaintiffs to be fully paid for Thanksgiving and Christmas holidays, even though the project was shut down and Plaintiffs did not work.[62] On other projects, Defendant's customers shut down and only authorized payment for certain days of the Thanksgiving and Christmas holidays and not others.[63]  Thus, this case will require a project-by-project analysis regarding the circumstances when Opt-In Plaintiffs did not receive their full salary.[64]

In sum, Plaintiffs' sole argument in support of conditional certification was that they were collectively not paid on a salary basis.[65]  Because Plaintiffs had a weekly day rate guarantee on each project for which they were employed, and thus were then actually paid on a salary basis, the fact that their pay has been described as a "day rate" in an <u>internal</u> onboarding document does not undermine the salary basis test.  The relevant inquiry is whether the Plaintiffs

---

[60]      29 C.F.R. § 602(a)(1), (b)(1).
[61]      *See, e.g.,* Exh. 22, Popeck Dep. at pp 78-80 (paid for Labor Day and for personal day to attend wedding). *See also,* Exh. 5, Gust Decl. ¶¶ 8-9, Exhibits 1 and 2 thereto.
[62]      Exh. 5, Gust Decl. ¶¶ 8-9, Exhibits 1 and 2 thereto.
[63]      *Id.; see also,* Exh. 8, Phillips Decl., ¶ 16; Exh. 6, Moore Decl., ¶¶ 20-21.
[64]      It is noteworthy that, while Defendant disagrees with her findings, Plaintiffs' expert, Colleen Vallen identified 288 weeks for which Opt-In Plaintiffs did not receive their full weekly day rate guarantee.  Exh. 27, Supplemental Expert Report of Colleen Vallen, at p. 9, Updated Table 3 (288 "occurrences" out of 3,632 "total workweeks" for Opt-In Plaintiffs).  At a minimum, the facts demonstrate that no universal policy affected all the plaintiffs and collective certification is thus improper.  *See, e.g.*, *Frye v. Baptist Mem'l Hosp., Inc.*, 495 F. App'x 669, 673 (6th Cir. 2012) (affirming decertification of collective action where the sole common theory of liability rested upon a facially lawful pay policy that "cannot serve as the lone point of similarity supporting class certification" and where the remaining factual circumstances at issue "rely on employees' unique experiences"); *In re Tyson Foods, Inc.*, 694 F. Supp. 2d 1372, 1378 (M.D. Ga. 2010); *Simons v. Pryor's, Inc.*, No. 3:11-CV-0792-CMC, 2011 WL 3158724, at *9 (D.S.C. July 26, 2011), *adhered to in pertinent part on reconsideration*, 2011 WL 4345825 (D.S.C. Sept. 15, 2011); *Sargent*, 171 F. Supp. 3d at 1080.
[65]      *See* Plaintiff's Motion for Conditional Certification, Doc. No. 43, at pp. 6-9.

were actually paid a salary based on "what that worker actually received."[66]   In this case, Defendant's weekly day rate guarantee pay practice clearly does not bind Plaintiffs together based on a uniform policy which violates the FLSA.  Moreover, the issue of any salary basis violations is clearly not a class-wide issue but must be decided on a Plaintiff by Plaintiff, project by project, basis.[67]  Thus, each employee will have to be considered on an individual basis and this class should be decertified.

### D.     Resolution of WGM's Exemption Defenses Will Require Significant Individualized Factfinding, Rendering Collective Adjudication Inappropriate.

The Court must also consider whether WGM's assertion of individualized defenses, also supports decertification.[68]  WGM asserts several exemption defenses, highlighted below, that apply to some, but not all, Plaintiffs depending on their individual testimony, job duties, and project assignment.  Therefore, even assuming, *arguendo*, that disputes relating to the salary basis test issue, alone, do not preclude Plaintiffs from satisfying the "similarly situated" requirement of 29 U.S.C. § 216(b), that standard is certainly foreclosed by the individualized inquiries inherent in determining whether the various job classifications of the inspectors at issue satisfy the duties tests of the administrative, executive, and/or highly compensated employee exemptions.[69]

---

[66]      *Orton*, 668 F.3d at 847, 848 n.4; *Hughes* at *4; *Sloane* at *20.

[67]      *Sloane* at *17 (holding that class certification is not appropriate when the court "will necessarily need to inquire into the individual" circumstances regarding each Plaintiff's pay.)

[68]      *Sloane* at *6; see also *Kuznyetsov v. W. Penn Allegheny Health Sys., Inc.*, No. 10-948, 2011 WL 6372852, at *7 (W.D. Pa. Dec. 20, 2011) (holding that individualized defenses were highly relevant and likely to "overwhelm" a collective proceeding).  As in *Kuznyetsov*, WGM's defenses will be unique to specific plaintiffs, thus trying this case in a collective forum will prevent WGM from employing its defenses and turn the trial into 93 mini-trials – rendering WGM unable to delve into the specifics of each Plaintiff's situation.

[69]      *See, e.g.*, *Green v. Harbor Freight Tools USA, Inc.*, 888 F. Supp. 2d 1088, 1103 (D. Kan. 2012) ("[I]ndividualized defenses inhibit the efficiency of proceeding on a collective basis."); *Cornell*, 2015 WL 6662919, at *4 ("The presence of many individualized defenses makes a representative class unmanageable, and 'several courts have granted motions for decertification on this basis.'"), quoting *Crawford v. Lexington-Fayette Urban Cnty. Gov't*, No. CIV.A. 06-299-JBC, 2008 WL 2885230, at *9 (E.D. Ky. July 22, 2008).  In other words, whether WGM has classified certain Inspector employees as non-exempt employees or paid them based upon a "day rate," alone, is

Each overtime exemption at issue (administrative, executive, highly compensated employee, or some "combination" thereof) consists of three tests: "(1) a duties test; (2) a salary-level test; and (3) a salary-basis test."[70] The Opt-In Plaintiffs, to date, have challenged only the salary basis test of the exemptions at issue. For the reasons discussed, *infra,* a determination of whether the salary-basis test is satisfied mandates a focused inquiry as to the reasons and circumstances for any reductions in the inspectors' salaries (*i.e.,* payments of less than the weekly day-rate guarantee), though there can be no question that WGM's policy of compensating inspectors via a weekly day-rate guarantee satisfies the salary-basis requirement. Likewise, Plaintiffs have not and cannot reasonably dispute that the salary-level test, which requires that exempt employees receive a salary of no less than $455 per week, is satisfied. Several Opt-In Plaintiffs were paid in excess of $100,000 annually—far above the $455 weekly minimum.[71]

Presumably, though they have not yet raised the argument to date, Plaintiffs will argue that they are similarly-situated with respect to the duties they performed. This too fails. Just as the district court in *Sloane* held that the "similarly titled jobs, like 'pipeline inspector,' often entail different job duties from project to project, as each client sets the job duties for each … employee on its projects[,]" so too is the case here—particularly in light of the exemptions asserted by WGM.[72] Even with respect to inspectors sharing a common position and/or job title,

---

insufficient to establish a "common and unlawful policy" or to support certification given that some number of the putative plaintiffs were indisputably paid on a salary basis and that the duties of these employees varied significantly and potentially qualify them as exempt from the overtime requirement in the first place. *See, e.g., Lipnicki v. Meritage Homes Corp.,* No. 3:10-CV-605, 2014 WL 5620603, at *3 (S.D. Tex. Nov. 4, 2014); *Creely v. HCR ManorCare, Inc.,* 920 F. Supp. 2d 846, 852-53 (N.D. Ohio 2013). Continuing to certify a class in this case, therefore, would result in a highly fragmented trial wherein the factual bases underlying the FLSA exemptions WGM asserts must be individually analyzed for each Plaintiff. Such a result is untenable, and dictates against conditional certification.

[70] *Orton,* 668 F.3d at 846.

[71] See Perez Decl., ¶ 5 and Exhs. 3-4 thereto.

[72] *Sloane* at *11.

and *even* on the same project, their qualification for one or more exemptions may vary depending on their compensation and how they actually spent their working time.[73]

Specifically, the 93 Opt-In Plaintiffs worked in one or more of at least thirteen different inspection positions, including:

- Chief Inspector,
- Assistant Chief Inspector,
- Welding Inspector,
- Sr. Welding Inspector,
- Safety Inspector,
- Civil Construction Inspector,
- E & I Inspector,
- Craft Inspector,
- Material Inspector,
- Environmental Inspector,
- Utility Inspector,
- Coating Inspector, and
- Electrical Inspector.[74]

Each of these classifications is associated with a different set of job duties and scope of work.[75]

For example, Utility Inspectors were often called upon to ensure that ditches were properly excavated or that right-of ways were properly cleared. They also could perform tasks such as watching the contractor build a barbwire fence or backfill the pipe or conduct hydrotesting on the pipe to be sure the work was performed within specifications.[76] Environmental Inspectors watched for equipment oil spills, ensured that environmental requirements set out in federal, state, and local permits were adhered to, and similar

---

[73]     *See, e.g., Smith v. Johnson & Johnson,* 593 F.3d 280, 283 n.l, 285 (3d Cir. 2010) (FLSA administrative exemption); *Ale v. Tenn. Valley Auth.,* 269 F.3d 680, 688-89 (6th Cir. 2001) (FLSA executive and administrative exemptions); *Olivo v. GMAC Mortg. Co.*, 374 F. Supp. 2d 545 (E.D. Mich. 2004) (finding that because defendant apparently satisfied the outside sales exemption for employees in plaintiff's job position, plaintiff failed to show a common policy or plan of misclassification).

[74]     Exh. 25, Zammit Decl., ¶ 7 and Exhibit F thereto.

[75]     Vandyk Decl., Doc. No. 40-2, ¶ 3; Exh. 25, Zammit Decl., ¶ 7; Exh. 8, Phillips Decl., ¶ 10; Exh. 7, Finke Decl., ¶ 10; *Sloane* at *11.

[76]     Exh. 7, Finke Decl., ¶ 10; Exh. 8, Phillips Decl. at 10; Vandyk Decl., Doc. No. 40-2, ¶ 3 and Exhibit A thereto; Exh. 18, Overton Dep., at pp. 36-37; Exh. 10, Long Dep., at p. 32; Exh. 9, Karl. Dep., at pp. 44-45.

environmental issues.[77]  Welding Inspectors would not perform any of those tasks but rather would ensure that pipeline welds met the appropriate standard, the correct grade of materials was utilized, that welding and tie-in procedures are in compliance with the appropriate standards, and were in charge of quality control over the welding of the pipeline.[78]  For their part, electrical inspectors would perform an entirely different set of tasks, primarily involving inspecting the installation of electrical equipment and ensuring that all loop, bump, med, and logic checkouts were performed properly.[79]

Chief Inspectors and Assistant Chief Inspectors likewise had a variety of job duties. The number of subordinate inspectors reporting to them varied greatly, from individual to individual and from project to project.  For example, Opt-In Plaintiff Randall Long testified that, when he was a Chief Inspector, from zero to as many as 14 inspectors reported to him at any given time, depending on the project and stage of that project.[80]  Even among inspectors holding the same positions, job duties varied dramatically depending on the their experience, the size and scope of the project, the customer's specifications, and which area of a project they were assigned to on a particular day.  For example, while some Inspectors had authority to order contractors to perform remedial work, depending on the project and supervisor, others did not have this authority and needed approval from their supervisor(s).[81]

---

[77]     Exh. 9, Karl Dep., at pp. 40-41; Vandyk Decl., Doc. No. 40-2, ¶ 3 and Exhibit A thereto.

[78]     Exh. 7, Finke Decl., ¶ 9; Exh. 9, Karl Dep., at pp. 33, 40; Vandyk Decl., Doc. No. 40-2, ¶ 3 and Exhibit A thereto.

[79]     Exh. 9, Karl Dep., at p. 44; Vandyk Decl., Doc. No. 40-2, ¶ 3 and Exhibit A thereto.

[80]     Exh. 10, Long Dep. at p. 24; Exh. 8, Phillips Decl., ¶ 9 (supervising as many as 18 inspectors in seven different crews).

[81]     Exh. 6, Moore Decl., ¶ 9 (utility inspector had authority); Exh. 7, Finke Decl., at ¶ 12 (senior welding inspector had authority); Exh. 8, Phillips Decl., ¶ 11 (utility inspector had authority); Exh. 4, Whitmire Dep., at pp. 70-71 (utility and welding inspector required approval); Exh. 10, Long Dep., at pp. 32-33; Exh. 13, Menor Dep., at pp. 64, 66 (coating inspector had authority); Exh. 9, Karl Dep., at pp. 33-34, 37 (welding inspectors had authority); Exh. 17, Mullett Dep., at p. 74 (utility inspector had authority); Exh. 21, Clark Dep., at p. 23 (utility inspector had authority); Exh. 22, Popeck Dep., at pp. 52-53 (environmental inspector required approval); Exh. 18, Overton Dep., at p. 32 (welding/utility inspector had authority).

It is precisely these types of variations that the district court in *Sloane* found made collective adjudication of the plaintiffs' claims in that case impracticable.[82]  Because individualized inquiries are required to assess not only the work performed by each Plaintiff, but how each Plaintiff performed the work and the degree of authority granted to and exercised by that Plaintiff, collective adjudication of WGM's exemption defenses is simply not feasible.[83]

## 1. Administrative Exemption

The Administrative Exemption applies to employees who earned a weekly salary of at least $455, performed non-manual work related to the management or operations of the employer's customers, and exercised discretion and independent judgment with respect to matters of significance.[84]  The case law is clear that pipeline inspectors such as those at issue here, may, under certain circumstances, qualify for the Administrative Exemption.

In *Brock v. On Shore Quality Control Specialists, Inc.*, No. A-84-CA-603, 1987 WL 31308 (W.D. Tex. Sept. 29, 1987), for example, the court held that plaintiff pipeline and welding inspectors were subject to the administrative exemption because their primary duty

---

[82]    *Sloane* at *15 ("[t]he Court will have to consider each of the pertinent elements [of each asserted exemption] as they apply to each potential claimant" thus rendering certification inappropriate).  The Plaintiffs in *Hughes* did not even attempt to assert that they were factually similarly situated as to the exemptions, choosing instead to rely solely on their salary basis assertion. *Hughes* at *3.

[83]    *Sloane* at *12.  *Bramble v. Wal-Mart Stores, Inc.*, No. 09-4392, 2011 WL 1389510, at *5 (E.D. Pa. Apr. 12, 2011).  Courts cannot presume employees are similarly situated simply because they hold similar job titles. *Morisky v. Public Serv. Elec. And Gas Co.*, 111 F. Supp. 2d 493, 498 ("[e]ven employees who hold the same job title do not necessarily perform the same work"); *Evancho v. Sanofi-Aventis U.S. Inc.*, No. 07-2266, 2007 WL 4546100, at *3 (D.N.J. Dec. 19, 2007) ("[e]mployees' status under the FLSA may vary, even if they have the same job title, if their job responsibilities and duties differ among each other.  This is because such differences are relevant to the statutory criteria of the FLSA exemptions.  Potential collective action members, thus, are not "similarly situated" as to FLSA status when that status may differ depending on their job responsibilities and duties.").

[84]    29 C.F.R. § 541.200(a).  The Plaintiffs' work, although varying substantially from inspector to inspector, was directly related to the management and general business operations of WGM or WGM's customers. 29 C.F.R. § 541.201(a).  Among other things, they inspected to ensure that the contractors performed work completely, safely, and correctly, and they reported on the progress of the contractor's work daily, through written reports submitted through the Chief Inspector to the client.  Exh. 6, Moore Decl., ¶ 7; Exh. 7, Finke Decl., ¶¶ 6, 13; Exh. 8, Phillips Decl., ¶ 12; Exh. 16, Hollier Dep., at pp. 58-59; Exh. 14, Hoth Dep., at pp. 14-15; Exh. 9, Karl Dep., at pp. 39-40; Exh. 10, Long Dep., at p. 39 (noting, however, that some projects were "light duty" and reports could be submitted every few days rather than daily, another distinction between the Inspectors' duties depending upon the project to which they were assigned).

consisted of the performance of non-manual oil and gas pipeline inspection work directly related to the general business operations of the employer's customers and required the exercise of independent discretion and judgment.[85]

> It is readily apparent from the testimony presented at the trial that all the inspectors employed by the Defendants used their independent judgment and discretion to carry out their duties.  The inspectors used their judgment and discretion in testing welders, making recommendations that employees of the contractors should be dismissed, shutting down jobs when unsafe conditions so merited, dealing with landowners and making daily decisions as to whether the contractor was in fact performing the contract in a suitable manner. Plaintiff's argument that the inspectors were [sic] merely apply the specifications set by the contract or by a certain prescribed industry standards is not supported by the evidence. Although the inspectors did work pursuant to specifications set by the contract, the evidence showed that their powers included the ability to deviate from those specifications when the situation required. The evidence indicated that on numerous occasions, sometimes on a daily basis, the inspectors deviated from prescribed standards. There is no question from a review of the evidence that the inspectors were not mechanically applying the standards set by prescribed specifications. The judgment exercised by the inspectors was in most situations independent. The evidence showed that on most occasions the inspectors acted without approval from their superiors and only notified their superiors after a decision had been made and implemented.[86]

Similarly, in *O'Dell v. Alyseka Pipeline Serv. Co.*,[87] the Ninth Circuit reversed the trial court and held that an oil pipeline inspector was exempt based upon the highly compensated employee and administrative exemptions.  The panel ruled that pipeline inspection involved the requisite exercise of discretion and independent judgment because such work included opining on the safety of objects inspected, recommending remedial courses of action, persuading the client to make the recommended changes, interpreting codes, and negotiating with field supervisors to correct discrepancies on site.[88]

---

[85]     *Brock*, 1987 WL 31308, at *7.
[86]     *Id.*
[87]     856 F.2d 1452 (9th Cir. 1988).
[88]     *O'Dell*, 856 F.2d at 1454; *see also Schaefer v. Indiana Michigan Power Co.*, 358 F.3d 394, 402 (6th Cir. 2004).

Whether cases like *Brock* and *O'Dell* are dispositive on the issue of Plaintiffs' exemption status compels at least three individualized inquiries bearing on the Administrative Exemption duties test, specifically: (1) identifying the primary duty of each Opt-In Plaintiff (2) determining whether a specific Opt-In Plaintiff's primary duty was non-manual work and whether the answer to that inquiry varies depending on the project to which that individual was assigned and the position held, and (3) determining whether that primary duty includes discretion and independent judgment with respect to matters of significance.[89]   These inquiries necessarily require an assessment of the frequency, duration, and manner in which duties were performed—an assessment that is different for each Plaintiff, is fact-intensive, and therefore cannot be made on a collective basis.[90]

In summary, because the tasks performed by an individual Plaintiff depend not only upon a Plaintiff's job classification, but also the project(s) to which that Plaintiff was assigned, the portion of the project to which the each Plaintiff was assigned each day, and the manner in which the individual Plaintiff performed the assigned task, there are no common factual links that could drive a streamlined legal analysis for any group of inspectors on the administrative exemption and this case should therefore be decertified as a collective action.

---

[89]     29 C.F.R. § 541.200(a).

[90]     *Sloane* at *11.  *See also, Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 220 (D. Conn. 2003); *see, e.g., Bradford v. CVS Pharmacy, Inc.*, 308 F.R.D. 696, 702 (N.D. Ga. 2015) (holding that "given the various differences among their job duties, it is likely that the Court would have to conduct [an] individualized inquiry for each Plaintiff to determine what his or her primary duties were. Thus, the Plaintiffs' argument does not counsel in favor of preserving the collective action." and "[g]iven the material distinctions between the respective job duties of the Plaintiffs, the Court would still have to conduct a separate analysis for each Plaintiff to determine whether that defense applies to him or her. Accordingly, the Plaintiffs have failed to establish that they, the members of the collective action class, are 'similarly situated.'"); *Smith*, 2011 WL 96868, at *18 ("Because of the fact-intensive nature of the exemption analysis, the variation in the job duties of the service supervisors weighs heavily against permitting the action to continue as a collective one." (citations omitted)).  *Compare* 29 C.F.R. § 541.202(a)-(f) (describing factors for determining whether employee exercises discretion and independent judgment sufficient for administrative exemption), *with* 29 C.F.R. § 541.203(g), (j) (explaining why ordinary inspection work and inspections by public inspectors are non-exempt).

## 2. Executive Exemption

The Executive Exemption applies to Plaintiffs who, *inter alia*, regularly directed the work of at least two other employees, and whose recommendations as to the hiring and firing, advancement, or promotion of other employees were given weight.[91]  As with the Administrative Exemption, individualized inquiries are necessary to determine, among other things, whether (1) the employee "customarily and regularly directs the work of two or more other employees," and (2) the employee "has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight."[92]  Because the job duties, reporting relationships and organizational structure of supervisory positions like Chief Inspector and Assistant Chief Inspector vary greatly based upon the scope of work, number of contractors and inspectors, and other project-specific factors, there is no generalized set of facts or single analysis for determining whether these Plaintiffs are subject to the executive exemption.[93]

Supervising, directing, and training other employees is an executive duty contemplated by the regulations, and will allow the application of the Executive Exemption.[94]  In the instant case, it is clear that supervising and directing the work of other employees is a key responsibility of many Chief Inspectors and Assistant Chief Inspectors, and includes activities that the regulations make clear are exempt, such as:

- Supervising a group of Inspectors.
- Making work assignments and assigning duties to Inspectors.

---

[91]     29 C.F.R. § 541.100(a).

[92]     29 C.F.R. § 541.100; *see, e.g.*, *Smith v. Heartland Auto. Servs.*, Inc., 404 F. Supp. 2d 1144, 1152 (D. Minn. 2005) (decertifying the class after finding significant disparities among plaintiffs regarding their ability to exercise discretion; perform management tasks; act independently of the direct superior; and control hiring, firing, and discipline).

[93]     Exh. 6, Moore Decl., ¶ 12; Exh. 7, Finke Decl., ¶ 13; Exh. 8, Phillips Decl., ¶ 12; Exh. 10, Long Dep., at 24. Wood Group contends that a number of the opt-in Chief Inspectors and Assistant Chief Inspectors are subject to the executive exemption.

[94]     29 C.F.R. § 541.102(b); *Mitchell v. Abercrombie & Fitch, Co.*, 428 F. Supp. 2d 725, 744 (S.D. Ohio 2006).

- Directing the work of employees.
- Ensuring that all contractor work is in compliance with specifications.[95]

However, simply carving out Chief Inspectors and Assistant Chief Inspectors from the collective action or addressing them as a separate group from other Plaintiffs does not resolve the problems with collective treatment or individualized inquiries. Other Plaintiffs, including named-Plaintiff Tommy Fenley, for example, were sometimes given authority to make employment decisions for their subordinates, though such authority was not automatic and in Fenley's case, granted at the discretion of his Chief Investigator. For example, Fenley had authority to and did hire and fire Welding Inspectors on his project, though this was not typical.[96] Accordingly, as is the case with the administrative exemption, individualized analysis will be necessary to determine the extent to which each Plaintiff was customarily and regularly engaged in activities that may render him or her be exempt under the Executive Exemption, which requires an in depth and individual examination.

### 3. Combination Exemption

Pursuant to the combination exemption, the time an employee spends performing duties exempted under one FLSA exemption may be combined with the time the employee spends performing duties exempted under another FLSA exemption to qualify the employee for exemption.[97] "[T]he combination exemption provides a mechanism for cobbling together different exempt duties for purposes of meeting the primary-duty test."[98] "Thus, for example, an employee whose primary duty involves a combination of exempt administrative and exempt

---

[95] 29 C.F.R. § 541.102; *see* Vandyk Decl. Doc. No. 40-2, at ¶ 3 and Exh. A thereto; Exh. 6, Moore Decl. ¶¶ 12-14; Exh. 7, Finke Decl., ¶¶ 3, 14, 16; Exh. 8, Phillips Decl., ¶¶ 12-14; Exh. 12, Gust Dep., at p. 114; Exh. 1, Fenley Dep., at p. 18; Exh. 10, Long Dep., at pp. 24, 27.
[96] Exh. 26, Declaration of Jerred Pierson, ¶ 7.
[97] 29 C.F.R. § 541.708.
[98] *IntraComm, Inc. v. Bajaj*, 492 F.3d 285, 294 (4th Cir. 2007).

executive work may qualify for exemption."[99] The combination exemption underscores the breadth of the individualized inquiries required to determine if a Plaintiff whose primary duty is not purely administrative or executive, for example, is nevertheless exempt.

Here, some Plaintiffs may qualify for the combination exemption, depending upon their duties. For instance, some Assistant Chief Inspectors' primary duty may involve a combination of administrative (such as compiling junior Inspectors' reports each day for submission to the Chief Inspector) and executive (supervising other Inspectors) duties such that they would qualify as exempt under the combination exemption.[100] In any event, WGM's assertion of this exemption will require an individualized analysis of each Plaintiff's duties on a project-by-project basis to determine who is arguably subject to the exemption, rendering collective certification inappropriate.

### 4. Highly-Compensated Employee Exemption

The Highly-Compensated Employee Exemption applies to Plaintiffs who earned over $100,000 in annual compensation, performed non-manual work, and regularly performed at least one of the exempt duties of an exempt Executive or Administrative employee.[101] The Highly-Compensated Employee Exemption provides that, if an employee makes at least $100,000 annually, including at least $455 per week on a salary basis, then the employee is exempt "if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative, or professional employee."[102] "An employee may qualify as a highly compensated executive employee, for example, if the employee customarily and regularly directs the work of two or more other employees, even though the

---

[99] 29 C.F.R. § 541.708.
[100] Exh. 6, Moore Decl., ¶¶ 10, 13-14.
[101] 29 C.F.R. § 541.601 (a).
[102] 29 C.F.R. § 541.601(a).

employee does not meet all of the other requirements for the executive exemption."[103]

These are not minimum-wage earners working in less than ideal conditions. Plaintiffs are all professional pipeline inspectors performing non-manual work.[104] Many of the Opt-In Plaintiffs earned over $100,000 per year during the years they worked for WGM.[105] Others, however, did not.[106] Plaintiff Terry White, for example, never earned more than $40,000 annually during his tenure with WGM (2012 and 2013).[107] The same is true of Opt-In Plaintiff Deborah Miller, who was paid just over $92,000 in 2012 and $96,000 in 2013.[108] Timothy Karl, on the other hand, made more than $100,000 in each of the four years he worked on projects for WGM.[109] Because many of the Opt-In Plaintiffs made more than $100,000 for some if not all of the years they worked as inspectors on projects for WGM, the Court will necessarily have to engage in an individualized analysis as to whether those individuals regularly performed <u>any one or more</u> exempt duties or responsibilities of an Executive or Administratively Exempt employee in order to determine whether the Highly-Compensated Employee Exemption applies.[110] For the reasons discussed above, those determinations plainly are not susceptible to common proof. Accordingly, because the potential application of the Highly-Compensated Employee Exemption will be individualized, the Opt-In Plaintiffs are not similarly situated, and this matter is therefore inappropriate for continued collective treatment.

---

[103]    29 C.F.R. § 541.601(c); *Hendricks v. Total Quality Logistics, LLC*, 292 F.R.D. 529, 540 (S.D. Ohio 2013).
[104]    *Sloane* at *1. *See also, e.g.,* Exh. 6, Moore Decl., ¶ 5.
[105]    Exh. 3, Perez Decl., ¶ 5, Exhibits 3 and 4 thereto.
[106]    *Id.*
[107]    *Id.*
[108]    *Id.*
[109]    *Id.*
[110]    For those Opt-In Plaintiffs who only worked on projects for WGM a portion of a year, their annualized income was calculated by dividing the amount they were actually paid by the number of weeks they actually worked and then multiplying that figure by 52 weeks.

The courts have recognized that collective actions with both highly and non-highly compensated Opt-In Plaintiffs are subject to decertification.[111]  In this case, the mixture of both highly and non-highly compensated Opt-in Plaintiffs further supports decertification of this action.

In sum, each of these exemptions requires a fact-specific analysis of each individual's duties and responsibilities, and the differing testimony offered by the Opt-In Plaintiffs only heightens the individualized nature of their claims.  As the court recognized in *King v. West Corp.*, "[d]isparate individual defenses heighten the individuality of claims, and requiring the defendant to raise these arguments in a collective action suit undermines its ability to mount a clear and coherent defense to the case."[112]  Plaintiffs here have not and cannot offer any evidence to explain why a Chief Inspector at one location should be subject to the same exemption analysis as a Welding or Utility inspector who worked for that Chief, particularly when, as here, Plaintiffs were subject to different supervision and expectations depending upon the client and

---

[111]    29 C.F.R. § 541.601(a); *McPherson v. LEAM Drilling Systems, LLC*, No. 4:14-CV-02361, 2015 WL 1470554 (S.D. Tex. Mar. 30, 2015) (expressing doubt as to whether a class that includes both highly-compensated and non-highly-compensated plaintiffs can survive decertification stage); *Beauperthuy v. 24 Hour Fitness USA, Inc.*, 772 F. Supp. 2d 1111, 1132-33 (N.D. Cal. 2011) (decertifying a collective class because, *inter alia*, the defendant was asserting several exemption defenses, including the highly compensated employee exemption).

[112]    *King v. West Corp.*, No. 8:04-cv-318, 2006 WL 118577, at *15 (D.Neb. Jan. 13, 2006) , ; see *Holaway v. Stratasys, Inc.*, No. 12-998, 2013 WL 5787476, at *3 (D. Minn. Oct. 28, 2013) ("it is an individual question whether any of the Plaintiffs were exempt from the overtime requirements" and decertifying a class of only three plaintiffs because "[a]n analysis of whether each Plaintiff is exempt will be a highly individual inquiry, requiring an analysis of factors such as job independence, something that varied widely among these three Plaintiffs" and "if liability is also a mainly individual inquiry, then class treatment of this action is not efficient in any way."); *Cruz v. Lawson Software, Inc.*, 764 F. Supp. 2d 1050, 1061-62 (D. Minn. 2011) (decertifying the conditional class on the basis that defendant's potential exemption defenses pertained to some, but not all individual plaintiffs); *Soderberg v. Naturescape, Inc.*, No. 10-3429, 2011 WL 11528148, at *11 (D. Minn. Nov. 3, 2011) ("the individualized defenses disclosed by Naturescape convince the Court that such issues will dwarf the straightforward issue of damages as to the named Plaintiffs."); *Anderson v. Cagle's*, 488 F.3d 945, 954 n. 8 (11th Cir. 2007) (affirming decertification and noting that availability of defenses to some but not all of the putative class members posed "significant case management concerns"); *Basco v. Wal-Mart Stores, Inc.*, No. 00-3184, 2004 WL 1497709 (E.D. La. July 2, 2004) (denying collective certification because defendant's potential defenses would require individualized evidence unsuitable for collective treatment).

the particular worksite where they were assigned.[113]  These types of differences in duties are crucial in determining if the Opt-In Plaintiffs are similarly situated and they weigh heavily against continued collective treatment.[114]  Given the wide variety of inspection jobs held by the Opt-In Plaintiffs, the variety of tasks they performed, the manner in which each Plaintiff performed his or her work, and the discretion and authority granted and exercised by each inspector, any similarities among the Opt-In Plaintiffs are overwhelmed by critical differences in their experiences.

### E.    Considerations of Fairness and Manageability Support Decertification.

The third and final factor examines whether the Court can coherently manage a trial and avoid jury confusion.  This factor centers on fairness, efficiency, and procedural considerations, and requires the court to consider whether the litigation "would require inquiry into the employment situation of each plaintiff rather than on a broad scale approach to the employment situation of the group."[115]  "When ruling upon a decertification motion, coherent management of the trial and avoidance of jury confusion are essential considerations."[116]  When the key issues require individualized inquiries, as is the case here, managing a trial becomes problematic for the court, the parties, and the jury.[117]

Failure to allow WGM to try individual defenses as to each Plaintiff would further violate WGM's due process rights because each Plaintiff's case requires consideration of different

---

[113]     Exh. 6, Moore Decl., ¶¶ 3, 12; Exh. 7, Finke Decl., ¶¶ 6, 10; Exh. 8, Phillips Decl., ¶¶ 10, 12; Exh. 9, Karl Dep., at pp. 52-3; Exh. 22, Popeck Dep., at p. 16.

[114]     *Sloane* at *11-*12.

[115]     *Sloane* at *10 (emphasis added); *Lusardi v. Xerox Corp.*, 110 F.R.D. 351, 360 (D.N.J. 1987); *Crawford v. Lexington-Fayette Urban Cnty. Gov't*, No. CIV.A. 06-299-JBC, 2008 WL 2885230, at *11 (E.D. Ky. July 22, 2008) ("[T]he court must determine whether it can manage the class in a manner that does not cause prejudice to any party.").

[116]     *Sargent*, 2016 WL 1169457, at *12; see *Gatewood v. Koch Foods of Mississippi, LLC*, No. 3:07-CV-00082 KS–MTP, 2009 WL 8642001, at *20 (S.D. Miss. Oct. 20, 2009) ("a collective action is designed to permit the presentation of evidence regarding certain representative plaintiffs that will serve as evidence for the class as a whole. It is oxymoronic to use [the collective action] device in a case where proof regarding each individual plaintiff is required to show liability.").

[117]     See *Douglas v First Student, Inc.*, 888 F. Supp. 2d 936 (S.D. Iowa 2012).

background facts and different testimony based on each Plaintiff's particular project, work activities, location, compensation, and classification.   Representative testimony cannot accurately capture each Plaintiff's diverse factual circumstances, nor does it allow WGM to sufficiently raise individual defenses to each Plaintiff.   Failing to decertify the class would thus unduly prejudice WGM by essentially requiring nearly 100 mini-trials on Plaintiffs' various claims and applicable defenses.   Moreover, it would confuse the jury.   The potential for these consequences outweighs any benefit to maintaining a collective action.[118]   Simply put, this action is unsuitable for collective treatment because where, as here, "there are significant differences in employment experiences, the procedural advantages of a collective action evaporate, and the court's ability to render a just verdict on the merits is seriously undermined."[119]  Thus, fairness and procedural considerations weigh in favor of decertification.

Moreover, viewed from the perspective of class manageability, the trial of the named Plaintiffs' claims would not necessarily resolve the claims of class members who held *different* positions, performed *different* job duties, worked on *different* projects, worked for *different* clients, or reported to *different* supervisors.   For example, examining named Plaintiff Tommy Fenley's job duties as a welding inspector who reported to the Chief Inspector (Jerred Pierson) on the Tallgrass project in Ohio will not answer the question, for example, whether a utility inspector on the Tallgrass project, such as Brock Tagarook, was exempt.   Examining Fenley's job duties as

---

[118]       See *Harrison v. Delguerico's Wrecking & Salvage, Inc*., No. CV 13-5353, 2016 WL 826824, at *7 (E.D. Pa. Mar. 2, 2016) ("[T]his Court must also consider the manageability of the class and the fairness to Defendants. Due to the numerous different job titles and responsibilities, as well as the multiple defenses applicable to the individual Plaintiffs, we conclude that the fairness and procedural considerations weigh against a collective action."); *King*, 2006 WL 118577, at *15 ("Disparate individual defenses heighten the individuality of claims, and requiring the defendant to raise these arguments in a [collective] action suit undermines its ability to mount a clear and coherent defense to the case.").

[119]       *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 587-88 (E.D. La. 2008) (granting decertification motion because "serious concerns about due process" would be raised, and holding that "[the defendant] cannot be expected to come up with 'representative' proof when the plaintiffs cannot reasonably be said to be representative of each other"); *Robinson v. Dolgencorp*, No. 5:06-cv-122, 2006 WL 3360944 (M.D. Fla. Nov. 13, 2006).

a welding inspector on the Tallgrass project will likewise not answer the question of whether a welding inspector on another project, who exercised more (or less) discretion by the nature of his particular project or supervisor, is exempt. Indeed, examining an inspector such as Opt-In Plaintiff Christopher Hoth's job duties on one project as a Utility Inspector will not even answer the question of whether Hoth himself was exempt during his work on a different project because he testified that his job was different at each respective project he worked on for WGM.[120] Every Plaintiff's job duties on every project will need to be individually scrutinized to determine whether he performed exempt or non-exempt job duties.

In sum, there is little, if any, overlap of proof from one Plaintiff's claim to another, given that Plaintiffs worked on different pipelines in different job classifications and inspected different crews performing different work. The Opt-In Plaintiffs share no common thread and they offer no reasons why resolution of an FLSA claim for a Welding Inspector who worked on the Tallgrass project in Ohio is any way comparable to or in any would expedite the claim brought by a Chief Inspector who worked for Kinder Morgan on a project in Texas. To the contrary, this case involves a very diverse group of Plaintiffs who worked in different locations, in different job positions, and for different clients and supervisors. Indeed, despite the inherent and significant variance that attends the pipeline inspector position, as the *Sloane* court aptly noted, Plaintiffs' proposed nationwide class includes <u>every</u> type of inspector on <u>every</u> kind of project for <u>every</u> client in <u>any</u> state. There is no common thread among such diverse Plaintiffs and the class should be decertified – indeed, courts routinely reject the claim that all employees

---

[120] Exh. 14, Hoth Dep., at pp. 13-14, 18-20.

nationwide are "similarly situated" because the individualized determinations inherent in the exemption analysis makes it impossible to effectively litigate on a collective basis.[121]

Further, WGM would be greatly prejudiced by the continued litigation of this case as a collective action.  At trial, sorting out the job classifications, assigned tasks, and personal choices about how to perform work across more than 90 Opt-In Plaintiffs and at least thirteen job classifications for the various duties test elements on the disputed exemptions will, by the sheer volume of data and myriad jury instructions, confuse a jury and prejudice WGM's inherently individualized exemption defenses.[122]  After the lengthy presentation of voluminous evidence discussed above for each named and Opt-In Plaintiff, the court will be required to present the jury with unique jury charges and special interrogatories for each Plaintiff.  These charges and interrogatories must explain and explore the various elements of the exemption (and other) defenses that apply to each person.  For example, determining each Plaintiff's primary job duty under an exemption requires an analysis "based on all the facts in a particular case," including factors such as relevant importance of the exempt duties compared to others; time spent on

---

[121]       *Sloane* at \*11-\*12; *see, e.g., In re Morgan Stanley Smith Barney LLC Wage & Hour Litig,* No. 11-cv-3121-WJM, 2016 WL 1407743, \*5 (D.N.J. Apr. 11, 2016) (denying conditional certification after noting that "[unsurprisingly, determining whether an employee is exempt involves a fact intensive inquiry . . . ."); *Harriet* v. *Wal-Mart Stores, Inc.,* No. 11-cv-2510-MLC, 2012 WL 2878078, \*5 (D.N.J. July 13, 2012); *Holt v. Rite Aid Corp.,* 333 F. Supp. 2d 1265, 1272 (M.D. Ala. 2004).  Indeed, in  *Glatt* v. *Fox Searchlight Pictures, Inc.,* 811 F.3d 528,539-40 (2nd Cir. 2015), the Second Circuit recently held that a district court abused its discretion in granting nationwide certification due to the numerous individualized inquiries that would be required.  Similarly, a court in the Third Circuit denied conditional certification, noting that "[i]f proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." *Villanueva-Bazaldua* v. *TruGreen Ltd. Partners,* 479 F. Supp. 2d 411, 416 (D. Del. 2007); see also *Bamgbose* v. *Delta-T Group, Inc.,* 684 F. Supp. 2d 660, (E.D. Pa. 2010) ("[t]he Court must analyze whether the [employees] are similarly situated with respect to the analysis it would engage in to determine whether the workers are employees or independent contractors. . . . [The Court] must determine whether the proof to demonstrate that the workers are 'employees' or 'independent contractors' can be applied to the class as a whole.").  Because Plaintiffs' putative nationwide claims present the same individualized issues that led these other courts to deny conditional certification, this Court should follow suit and decertify this nationwide class.

[122]       *See, e.g., Creely*, 920 F. Supp. 2d at 857 (decertifying collective action where employees' disparate individual experiences drove their overtime claims; "Plaintiffs' right to compensation hinges on their individual experiences. It is unclear how proceeding collectively and using representative testimony would be fair or useful.").

exempt work; the employee's relative freedom from direct supervision; and comparative exempt and non-exempt salaries.[123]

Further, whether WGM has established that an Opt-In Plaintiff meets the administrative exemption (if that exemption is asserted as to a particular Opt-In Plaintiff), because the individual's primary duty included the "exercise of discretion and independent judgment," will require instruction to the jury on the meaning of that element and its own individual considerations, including amount of time spent on a job duties, relative freedom from direct supervision, and the amount and type of discretion exercised.[124] Similarly, the executive exemption will require, for opt-ins who are subject to the defense, jury instructions and interrogatories on whether the opt-in's primary duty included "management" (a term with specific meaning requiring explanation), and whether the opt-in "customarily and regularly" (again, requiring explanation) directed the work of two or more employees.[125] For an opt-in who is subject to the highly compensated exemption, these "duties" inquiries are relaxed, and the jury would receive an entirely different set of charges and interrogatories. In addition, any and all of these inquiries may be combined to form the "combination exemption" analyzed above, which would require yet another batch of instructions and interrogatories for any opt-in who potentially qualified. In any event, the jury's answers to special interrogatories and completion of a jury verdict form for one named or Opt-In Plaintiff would not answer the inquiries set forth for each of the other Plaintiffs. For these reasons, "continuing as a collective

---

[123]     29 C.F.R. § 541.700(a).
[124]     *See, e.g.*, 29 C.F.R. § 541.700(a)-(b), 29 C.F.R. § 541.201(a)-(b), 29 C.F.R. § 541.202(b).
[125]     *See* 29 U.S.C. § 213; 29 C.F.R. § 541.100(a), 29 C.F.R. § 541.600(a), 29 C.F.R. § 541.102, 29 C.F.R. § 541.701.

action would result in unfairness to [WGM] and inefficiency for the Court."[126]   As such, considerations of fairness and manageability weigh in favor of decertification.

## CONCLUSION

In sum, for all of the foregoing reasons, Plaintiffs' claims cannot be tried collectively because they implicate a host of individualized inquiries.   Accordingly, WGM's Motion to Decertify should be granted, the Court should issue and order decertifying the nationwide conditional class, and the Opt-In Plaintiffs' claims should be dismissed without prejudice.

Dated: May 18, 2017                              Respectfully submitted,


                                                 FRANK G. WOBST (0022958)
                                                 Porter, Wright, Morris & Arthur LLP
                                                 41 South High Street, 30th Floor
                                                 Columbus, Ohio 43215
                                                 Telephone: (614) 227-1903
                                                 Facsimile: (614) 227-2100
                                                 Email: fwobst@porterwright.com
                                                 *Trial Attorney*

                                                  /s/ Eric R. Miller
                                                 ERIC R. MILLER*
                                                 The Kullman Firm, APLC
                                                 4605 Bluebonnet Blvd., Suite A
                                                 Baton Rouge, LA 70809
                                                 Telephone: (225) 906-4250
                                                 Facsimile: (225) 906-4230
                                                 Email: EM@kullmanlaw.com
                                                 (*admitted *pro hac vice*)

                                                 S. MARK KLYZA (0027186)
                                                 The Kullman Firm, APLC
                                                 1600 Energy Centre, 1100 Poydras St.
                                                 New Orleans, LA 70163
                                                 Telephone: (504) 596-4125
                                                 Facsimile: (504) 596-4114
                                                 Email: SMK@kullmanlaw.com

---

[126]      *Cornell*, 2015 WL 6662919, at *5.

MICHAEL S. HUDSON*
The Kullman Firm, APLC
119 3rd Street South
Columbus, MS 39704
Telephone: (662) 244-8824
E-mail: MSH@kullmanlaw.com
(*pro hac vice)

**COUNSEL FOR DEFENDANT**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 18th day of May 2017, the foregoing was served upon the following counsel of record via email and Certified Mail/RRR:

JACK LANDSKRONER
DREW LEGANDO
Landskroner, Grieco Merriman, LLC
1360 West 9th Street, Suite 200
Cleveland, Ohio 44113
Email: jack@lgmlegal.com
Email: drew@lgmlegal.com

*Counsel for Plaintiffs*

SHANNON J. CARSON
SARAH R. SHALMAN-BERGEN
ALEXANDRA L. KOROPEY
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, Pennsylvania 19103
Email: scarson@bm.net
Email: sschalman-bergen@bm.net
Email: akoropey@bm.net

*Counsel for Plaintiffs*

/s/ Eric R. Miller
**ERIC R. MILLER**

47