# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

TOMMY L. FENLEY, *et al.,*

        **Plaintiff,**

v.

        **Case No.: 2:15-cv-326**
        **JUDGE SMITH**
        **Magistrate Judge Jolson**

WOOD GROUP MUSTANG, INC.,

        **Defendant.**

## OPINION AND ORDER

This matter is before the Court upon several motions: (1) Plaintiffs' Motion for Class Certification (Doc. 108); (2) Defendant Wood Group Mustang Inc.'s ("WGM") Motion to Decertify Conditionally Certified Class ("Motion to Decertify") (Doc. 110); and (3) WGM's Motion to Exclude the Testimony of Plaintiffs' Expert Colleen Vallen ("Motion to Exclude") (Doc. 119). All three motions are fully briefed and ripe for disposition. For the following reasons,

(1) Plaintiffs' Motion for Class Certification is **GRANTED**;

(2) WGM's Motion to Decertify is **DENIED**; and

(3) WGM's Motion to Exclude is **DENIED**.

## I. FACTUAL BACKGROUND

This case arises out of WGM's treatment of various Inspectors as exempt from the overtime provisions of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA") the Ohio Minimum Fair Wage Standards Act, Ohio Revised Code Chapter 4111, *et seq.* ("OMWA"), the

Pennsylvania Minimum Wage Act, 43 P. S. § 333.104(c); 34 Pa. Code § 231.41 ("PMWA"); and the Illinois Minimum Wage Law ("IMWL") 820 Ill. Comp. Sta. 105 § 4a (1). Named Plaintiffs Tommy Fenley (Ohio), William Peveto (Illinois), and Brockrobert Tagarook (Pennsylvania) are all current or former Inspectors at WGM for all or part of the relevant class periods.[1] Plaintiffs claim that WGM classified them, and all other Inspectors employed by WGM around the country during this time period, as "DAY—Non Exempt Day Rate" employees, but improperly treated them as exempt, salaried employees under the FLSA and applicable state wage laws. Plaintiffs further allege they, and other Inspectors, often worked more than 40 hours per week and were not paid overtime in violation of 29 U.S.C. § 207(a)(1).

WGM is a publicly-traded corporation incorporated in Ohio and headquartered in Houston, Texas. (Doc. 99, Am. Compl. ¶ 8). WGM operates in the gas and oil industry, with its business including "project management, construction management, engineering and procurement services to the offshore, onshore, oil sands, pipeline, refining, chemicals, and automation sectors." (*Id.* ¶ 9). WGM assigns its Inspectors to projects at the request of its clients for the purpose of inspecting the construction/assembly of pipeline systems. (Doc. 110-7, Gust. Decl. ¶ 3).

This Court previously described WGM's business structure, as it pertains to Inspectors, as follows:

> WGM's business structure includes five business units within its oil and gas division, one of which is named the "Pipeline Business Unit." The Pipeline Business Unit is tasked with "design[ing] and oversee[ing] the building of the pipeline." The Inspection Services Department is a "job family" within the Pipeline Business Unit. All Inspectors that Plaintiff seeks to represent here are— or were—employed within the Inspection Services Department.

---

[1] The fourth named Plaintiff, Lewis Whitmore, is a representative of a contemplated California class, which is not currently seeking Rule 23 class certification.

(Doc. 54, Cond. Cert. Op. and Ord. at 3) (internal citations omitted). The Inspections Services Department is managed by Andrew Gust (Doc. 108-4, VanDyk Dep. at 84:1–10). Gust reports directly to the Vice President of the Pipeline Business Unit, Mark Nussbaum. (*Id.* at 85:4–12). The Pipeline Business Unit was overseen by its Business Unit President, John Ellison. (*Id.* at 85:13–86:1).

There is no dispute that upon being hired by WGM, all Inspectors were assigned the pay code "DAY—Non Exempt Day Rate" within WGM's Human Resources Information System ("HRIS"). (*Id.* at 88:22–89:5). Further, WGM's employee handbook and internal Overtime Policy manual clarifies that all Exempt personnel are "compensated on a salary basis" and "Non-Exempt day rate Mustangers (DAY) receive a day rate that is inclusive of all hours worked, including overtime." (Doc. 108-3, Overtime Policy). At all times relevant, all Inspectors were categorically classified as described above. (Doc. 108-4, VanDyk Dep. at 105:8–10).

WGM has identified at least 13 different types of Inspectors comprising the conditionally certified class.[2] Unsurprisingly, the parties disagree over these positions' job responsibilities and the extent to which different types of Inspectors perform similar duties. Both parties extensively cite record deposition testimony to support their respective positions. Irrespective of Inspectors' specific titles or duties, the mechanics of how they were compensated was uniform. Four different WGM employees with firsthand knowledge regarding how the payroll process works testified to a common practice. Inspectors were instructed to enter a "1" on their timesheets for days worked and a "0" for days they did not work. There were also circumstances in which Inspectors entered a ".5" for a half day worked. The timesheets do not

---

[2] The official titles include: Chief Inspector, Assistant Chief Inspector, Welding Inspector, Sr. Welding Inspector, Safety Inspector, Civil Construction Inspector, E & I Inspector, Craft Inspector, Material Inspector, Environmental Inspector, Utility Inspector, Coating Inspector, and Electrical Inspector. (Doc. 111, WGM Decert. Mem. at 30 (citing Doc. 110-27, Zammit Decl. ¶ 7 and Ex. F thereto)).

reflect how many hours an Inspector worked on a given day. These timesheets are given to a field office where clerks manually enter the "1's or .5's" recorded by the Inspectors. Finally, this information is compiled in WGM's corporate office and checks are issued. (*See* Doc. 123-14, Archer Dep. at 43:12–23 (describing that Inspectors track days, not hours); Doc. 123-15, Geigler Dep. at 53:4–54:19 (same); Doc. 123-17, Fournerat Dep. at 21:6-22:19, 75:10-79:2 (confirming that Inspectors are paid on the number of days they work and describing the payroll process in general); Doc. 123-16, Zammit Dep. at 64:9–66:2 (generally describing payroll process). In general, whatever is reported on the timesheet is what Inspectors are paid. (Doc. 123-17, Fournerat Dep. at 90:4–6). Accordingly, Plaintiffs' theory of the case is that Inspectors are paid a full day's rate for each day they report as worked, and thereby do not satisfy the salary basis test.

Despite this seemingly straightforward methodology of payment, WGM contends that Inspectors were actually paid a guaranteed weekly day rate (of 5, 6, or 7 days) depending on the terms of contracts between WGM and clients for individual projects. (Doc. 110-7, Gust Decl. ¶ 5). WGM argues that this arrangement, subject to certain permissible reductions, satisfies the salary basis test.

## II.    PROCEDURAL HISTORY

Plaintiffs filed their Complaint on January 26, 2015. On July 20, 2105, Plaintiff Tommy Fenley moved for conditional certification of a collective action pursuant to the FLSA's provisions at 29 U.S.C. § 216(b). (Doc. 31). On March 17, 2016, the Court conditionally certified the collective comprising:

> All current and former employees of [WGM] who were classified with the pay code "DAY – Non Exempt Day Rate," and who worked in WGM's Pipeline Services Inspection Department as an inspector (or an equivalent position) in the United States in any workweek between three years prior to the date of the Court's Order and the present ("Inspectors").

(Doc. 54). Fenley then distributed Court-approved notice of the FLSA collective action to potential members of the Collective. The FLSA notice period has closed, and a total of 93 Inspectors (including the four named Plaintiffs) who worked for WGM around the country have filed consent forms to join the FLSA collective action. On November 21, 2016, Fenley was granted leave to amend his Complaint to add additional plaintiffs and causes of action arising under the state laws of Illinois, Pennsylvania, and California. (Doc. 98).

Meanwhile, the parties conducted discovery regarding Rule 23 class certification of Ohio, Illinois, Pennsylvania, and California classes[3], decertification of the nationwide collective action, and dispositive motions. WGM deposed 12 of the Opt-In Plaintiffs, Plaintiffs deposed at least 6 WGM employees (other than Inspectors), and both WGM and Plaintiffs retained an expert to opine on WGM's pay policies. The parties do not agree on the exact number, but there appear to be at least 122 current or former employees falling within the definition of Plaintiffs' proposed Rule 23 classes. (Doc. 117-2, Briles Decl. ¶ 3).

On May 18, 2017, Plaintiffs filed their Motion for Class Certification of the state claims under Federal Rule of Civil Procedure 23(b)(3) on behalf of those Inspectors who had worked for WGM in Ohio, Illinois, and Pennsylvania. (Doc. 108). The same day, WGM filed its Motion to Decertify the FLSA collective action. (Doc. 110). While those motions remained pending, WGM moved to exclude the expert testimony of Plaintiffs' expert witness, Colleen Vallen. (Doc. 119).

### III. DISCUSSION

Although filed last out of the three pending motions, the Court will address WGM's Motion to Exclude first because it bears on the record to be considered in deciding the Motion to

---

[3] Plaintiffs do not, at this time, seek certification of a California class.

Decertify. The Court will then consider WGM's Motion to Decertify and Plaintiffs' Motion for Class Certification in turn.[4]

## A.     WGM's Motion to Exclude

### 1.     Standard for Excluding Expert Testimony

The admissibility of expert witness testimony is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In parsing the rule, the Sixth Circuit has read it to require three criteria: (1) the witness must be qualified; (2) the witness's testimony must be relevant; and (3) the witness's testimony must be reliable. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008).

This rule reflects the well-established judicial precedent that district courts must act as "gatekeepers" in determining the admissibility of such testimony. *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429 (6th Cir. 2007) (discussing *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)). "[T]he gatekeeping inquiry must be tied to the facts of a particular case, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.* at 430 (internal

---

[4] The Court would like to take this opportunity to address the great extent to which the parties engaged in merits-based briefing for all three pending motions. Seven of the nine memoranda submitted by the parties exceeded the Court's preferred 20-page length, primarily for the purpose of belaboring positions on the ultimate issues in this case. While the Court appreciates the parties' zeal and recognizes the need to consider the character of the claims and defenses for the purposes of determining whether this case should proceed as a collective/class action, the present motions do not require an ultimate determination of those issues.

quotation marks and citation omitted). Although "not a definitive checklist or test," some factors that may bear on the analysis are:

> (1) whether a theory or technique . . . can be (and has been) tested; (2) whether the theory has been subjected to peer review and publication; (3) whether, with respect to a particular technique, there is a high known or potential rate of error and whether there are standards controlling the technique's operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Id.* at 429–30 (internal quotation marks and citations omitted). Moreover, "expert testimony prepared solely for purposes of litigation, as opposed to testimony flowing naturally from an expert's line of scientific research or technical work, should be viewed with some caution." *Id.* at 434.

The proponent of expert testimony must establish its admissibility by a preponderance of proof. *Nelson v. Tenn. Gas Pipeline, Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert,* 509 U.S. at 592 n.10). Whether to admit expert testimony is within the district court's discretion. *Johnson*, 484 F.3d at 429 (citation omitted).

### 2. Admissibility of Vallen's Testimony

Here, WGM challenges the admissibility of Vallen's testimony because two out of the three conclusions she reached are not relevant and the third was misleading and irrelevant. As those are the only stated grounds for objecting to the admission of her testimony—and this Court finding no independent reason to exclude her testimony—the Court's analysis will be limited to those issues.

The Court will briefly summarize the facts leading up to and surrounding Vallen's expert report before discussing the merits of WGM's relevance argument. The central question in this case centers around whether Inspectors were paid on a day rate basis (as Plaintiffs contend) or a

weekly day-rate guarantee satisfying the salary basis test (as argued by WGM). Consequently, Plaintiffs issued the following interrogatory to WGM during discovery:

> Identify each Project on which Plaintiff, any Opt-In Plaintiff, and any State Law Class Member worked during the applicable Relevant Time Period, and for each Project identified, state (i) whether you allege that Inspectors working on that Project would be guaranteed to be paid a certain number of day rate payments each week; (ii) the number of days per week you allege Inspectors were guaranteed pay for that Project (*i.e.*, 5, 6 or 7 days); and (iii) whether the alleged guarantee for that Project was dependent on the number of days the Inspector worked in a week.

(Doc. 123-5, WGM Resps. to Pls.' Second Set of Interrogs. at Interrog. No. 22). WGM responded as follows:

> All class members were guaranteed a weekly salary based on a day-rate of 5, 6, or 7 days, dependent upon the particular project. The guaranteed weekly salary was not dependent upon the number of days an inspector worked.

(*Id.*). Plaintiffs retained Vallen to analyze Inspectors' payroll records to determine whether, in her opinion, the actual pay received by Inspectors was consistent with the compensation plan described in WGM's interrogatory response. Ultimately, Vallen concluded that "a) Class Members' payroll and timesheet records demonstrate that the number of days listed as worked is equal to the number of days paid by Wood Group; b) Wood Group paid certain Opt-In Plaintiffs a half day rate; and c) that Class Members' records are inconsistent with Wood Group's Alleged Minimum Guaranteed Paid Days." (Doc. 123-8, Vallen Report ¶ 54). Plaintiffs explain Vallen's specific findings as follows:

> Specifically, Ms. Vallen's analysis found that 65% of Opt-In Plaintiffs were paid less than the minimum guaranteed day rate on at least once instance, and 7.9% of all weeks worked by Opt-In Plaintiffs were inconsistent with WGM's alleged minimum guarantee. Similarly, when including the relevant data for the Rule 23 Class Members as well, Ms. Vallen's analysis found that 62.1% of all Opt-In Plaintiffs and Class Members were paid less than the minimum guaranteed day rate on at least once instance, and 7.2% of all weeks worked were inconsistent with WGM's alleged minimum guarantee.

(Doc. 123, Pls.' Exclusion Resp. at 12 (citing Doc. 123-9, Supp. Vallen Report ¶¶ 37–38)) (internal citations omitted).

WGM's claims that Vallen's first and third conclusions are irrelevant and/or misleading because the numbers Vallen used to calculate days worked by Inspectors "do not (and were not intended to) reflect the days they actually worked." (Doc. 120, WGM Exclusion Mem. at 10). Further, WGM bases its argument that Vallen's third conclusion is misleading based on the fact that the FLSA permits employers to reduce an exempt employee's salary in certain limited circumstances without voiding the exemption. Plaintiffs counter that making these determinations was plainly outside the scope of Vallen's report because a) she cannot make legal conclusions as to whether WGM properly made reductions in accordance with the FLSA; and b) the purpose of her report was to determine whether the actual amounts paid to Inspectors comported with WGM's guarantee as set forth in WGM's response to Plaintiffs' Interrogatory 22—not whether they comported with the FLSA and its myriad of exemptions and deductions. Vallen concluded that the number of days Inspectors reported as working to WGM's payroll (regardless of whether they worked 15 hours, half days, one minute, or not at all) was equal to the days they were ultimately compensated. Meanwhile, she concluded that Opt-In Plaintiffs and putative class plaintiffs experienced 597 "occurrences" (*i.e.*, work weeks where the Inspector was paid for less days than his alleged guarantee) out of 8,247 total weeks (7.2%). (Doc. 123-9, Supp. Vallen Report ¶ 38).

The Court disagrees with WGM's position that Vallen's conclusions are not relevant to "the relevant inquiries[, which] are the propriety of continued collective treatment of this action and an evaluation of WGM's potential liability with respect to Plaintiffs—*i.e.,* whether they were entitled to overtime or properly treated as exempt employees." (Doc. 120, WGM Exclusion

Mem. at 17). In the Court's view, Vallen's report is relevant to the central issue in this case, even if they can ultimately be explained away to the trier of fact through lawful FLSA salary deductions, or by any other means. Further, while it is true that this Court must take on the role as "gatekeeper" and "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . confusing the issues [or] misleading the jury," Fed. R. Evid. 403, admissibility of expert testimony is within the district court's discretion. *Johnson*, 484 F.3d at 429 (citation omitted). Here, the Court finds Plaintiffs' expert testimony relevant and unlikely to confuse or mislead the trier of fact. As such, WGM's Motion to Exclude is **DENIED** and Vallen's report will be considered by the Court in determining WGM's Motion to Decertify.

**B.      WGM's Motion to Decertify**

WGM seeks to decertify the FLSA collective action because it asserts that the opt-in plaintiffs are not "similarly situated" as required by 29 U.S.C. § 216(b). For the following reasons, the Court disagrees.

**1.      Standard for Decertification**

The lead Plaintiffs bear the burden of showing that the opt-in plaintiffs are similarly situated to the lead Plaintiffs. *O'Brien v. Ed Donnelly Enterprises, Inc.*, 575 F.3d 567, 584 (6th Cir. 2009). The FLSA does not define the term "similarly situated," but the Sixth Circuit has instructed the lower courts analyzing decertification motions to consider:

(1)      the factual and employment settings of the individual plaintiffs,

(2)      the different defenses to which the plaintiffs may be subject on an individual basis, and

(3)      the degree of fairness and procedural impact of certifying the action as a collective action.

*Id.*

While conditional certification at the outset of a putative collective action requires only a minimal showing that the collective is similarly situated, plaintiffs must meet a higher standard at the decertification stage that accounts for the facts learned in discovery. *Monroe v. FTS USA, LLC*, 860 F.3d 389, 402 (6th Cir. 2017). Plaintiffs generally must produce "more than just allegations and affidavits" demonstrating similarity in order to achieve final certification. *Frye v. Baptist Mem'l Hosp.*, Inc., 495 F. App'x 669, 671–72 (6th Cir. 2012) (quoting *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1261 (11th Cir. 2008)). However, the Sixth Circuit has also cautioned that the FLSA's "similarly situated" standard "is less stringent" than the "predominance of common questions" inquiry applicable to class certification under Federal Rule of Civil Procedure 23(b)(3). *O'Brien*, 575 F.3d at 584.

Employees who "suffer from a single, FLSA-violating policy" or whose "claims [are] unified by common theories of defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct," are similarly situated. *Monroe*, 860 F.3d at 402 (quoting *O'Brien*, 575 at 584–85). "Where Defendants have demonstrated a formal policy to comply with the law and compensate employees for all time worked, Plaintiffs may satisfy their burden by producing substantial evidence of a *de facto* policy of circumventing the law." *Cornell v. World Wide Bus. Servs. Corp.*, No. 2:14-cv-27, 2015 WL 6662919, at *3 (S.D. Ohio Nov. 2, 2015) (Deavers, M.J.).

Should the Court determine that, after the more rigorous and fact-intensive analysis at the decertification stage, the claimants are similarly situated, "the district court allows the representative action to proceed to trial. If the claimants are not similarly situated, the district court decertifies the class, and the opt-in plaintiffs are dismissed without prejudice." *Waggoner*

*v. U.S. Bancorp*, 110 F. Supp. 3d 759, 765 (N.D. Ohio 2015), quoting *Douglas v. GE Energy Reuter Stokes,* No. 1:07-cv-077, 2007 WL 1341779, at *4 (N.D. Ohio Apr. 30, 2007).

### 2. Decertification Analysis

Here, the Court is not tasked with making an ultimate determination of whether Inspectors were classified and compensated as non-exempt, day-rate employees or salary-exempt employees. Rather, the Court must determine whether the Opt-In Plaintiffs are similarly situated so as to render collective treatment appropriate.

At a high level, WGM argues that the Opt-In Plaintiffs are not similarly situated because (1) they were paid on a salary basis (specifically, on a project-by-project basis with a guaranteed weekly day rate (5–7 days, depending on the project demands) regardless of whether such days were worked) (Doc. 111, WGM Decert. Mem. at 19–25); (2) several Opt-In Plaintiffs always received their weekly day rate guarantee, and therefore, suffered no damages (*Id.* at 25); (3) individual inquiries are required to determine why any particular plaintiff may not have been compensated in accordance with the salary basis test (*Id.* at 26–28); (4) WGM's administrative, executive, and/or highly compensated employee exemption defenses require individualized inquiries (*Id.* at 28–40); and (5) considerations of fairness and manageability support decertification (*Id.* at 40–45).

Conversely, Plaintiffs argue that the Opt-In Plaintiffs are similarly situated because: (1) they are able to show through common evidence that all Plaintiffs were compensated subject to a unlawful pay scheme (Doc. 118, Pls.' Decert, Resp. at 16–29); (2) the case does not require individualized inquiries (*Id.* at 29–32); and (3) fairness and procedural considerations favor final certification (*Id.* at 32–33).

The Court will now address these arguments, all of which fit within the factors set forth by the Sixth Circuit in *O'Brien*.

12

### a.    Factual and Employment Settings of the Individual Plaintiffs

The first factor in the decertification analysis, the factual and employment settings of the individual SMs, considers, "to the extent they are relevant to the case, the plaintiffs' job duties, geographic locations, employer supervision, and compensation." *Monroe*, 860 F.3d at 402. When this Court conditionally certified the putative class of Inspectors on March 17, 2016—after the parties had conducted limited discovery—it found that "all putative plaintiffs were categorized as 'DAY—Non Exempt Day Rate' employees and were paid on a day-rate basis." (Doc. 54, Op. and Ord. at 10).  Despite the fact another Court has characterized this information as a "smoking gun" (*see Sloane v. Gulf Interstate Field Servs., Inc.*, No. 4:16-CV-01571, 2017 WL 1105236, at *20 (M.D. Pa. Mar. 24, 2017)), the parties here have conducted additional discovery that may raise issues not readily apparent to the Court at the time of conditional certification.  Namely, WGM contends that despite this "DAY" paycode/human resources identifier being attached to Inspectors in WGM's internal databases, it indeed compensated Inspectors in conformity with a guaranteed weekly day rate that otherwise satisfies the FLSA's salary basis test.

The salary basis test is satisfied if the "employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602(a).  In making this argument, WGM relied heavily on the holding in *Hughes v. Gulf Interstate Field Servs., Inc.*, No. 2:14-CV-000432, 2016 WL 4197596 (S.D. Ohio Aug. 8, 2016) (Sargus, C.J.), *rev'd and remanded,* 878 F.3d 183 (6th Cir. 2017) for the proposition that "the focus is on 'pay received,' rather than the terms of the employment agreement, but the regulation still requires that a defendant show that the plaintiff was paid: '(1) a predetermined amount, which (2) was not subject to reduction (3) based on

quality or quantity of work performed.'" 2016 WL 4197596, at *3 (quoting *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 847-48 (6th Cir. 2012)). As the parties are surely aware, *Hughes* was reversed and remanded upon the Sixth Circuit's holding that "[w]e simply rule that the threshold question of whether there was a guarantee—not at issue in those cases, but very much disputed here—matters for determining whether employees whose pay was at least arguably calculated on a daily basis qualified as exempt." *Hughes v. Gulf Interstate Field Servs., Inc.*, 878 F.3d 183, 190 (6th Cir. 2017). Here, Plaintiffs similarly contend that no guarantee ever existed for Inspectors, they were paid a day rate, and WGM is attempting to retroactively apply an exemption (a guaranteed salary employment arrangement) despite not being able to prove the existence of said arrangement.

In light of the Sixth Circuit's holding in *Hughes*, it seems the ultimate the outcome of this matter is dependent on whether the Inspectors' salaries "[were] in fact guaranteed, or whether [they were] simply something that [WGM] had not so far availed itself of its right to reduce." *Hughes*, 878 F.3d at 191. Thus, the question for today is whether this Court should avail Plaintiffs of the right to pursue their claims collectively.

As noted above, all Inspectors were classified identically, *i.e.*, "DAY—Non Exempt Day Rate." WGM does not contest this point, but instead attempts to explain it away as a "mislabeling [] confined to an internal database of which most Plaintiffs were not even aware." (Doc. 122, WGM Decert. Reply at 7). The Court agrees with WGM that this classification can be overcome by an evidentiary showing that WGM compensated Inspectors on a day rate weekly basis regardless of whether the classification was deliberate or unintentional. However, the Court does not agree that this defense will be highly individualized and is not common to all Plaintiffs.

While Plaintiffs need not show at the decertification stage that all opt-in plaintiffs were improperly classified as exempt, Plaintiffs can carry their burden by showing that "the proposed class 'suffer[s] from a single, FLSA-violating policy,' and that 'proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs.'" *Myers v. Marietta Mem'l Hosp.*, 201 F. Supp. 3d 884, 895 (S.D. Ohio 2016) (Marbley, J) (quoting *O'Brien*, 575 F.3d at 585). However, this Court's analysis cannot rest solely on the fact that all Inspectors were categorically characterized as non-exempt day rate employees, even if the Court were to accept that as true. The Court must still look to the particular job duties of the various types of Inspectors. *See, e.g.*, *Morgan*, 551 F.3d at 1264 n.46 ("Just because a business classifies all employees in a particular job category as exempt does not mean that those employees are necessarily 'similarly situated' for purposes of a 29 U.S.C. § 216(b) collective action. Rather, it is necessary to review the actual job duties of those in that job category to determine whether they are similarly situated and whether the exemption defense can be collectively litigated."); *Long v. Epic Sys. Corp.*, No. 15-cv-81-BBC, 2016 WL 4625497, at *6 (W.D. Wis. Sept. 6, 2016) (same, citing *Morgan*); *Judkins v. Southerncare, Inc.*, 74 F. Supp. 3d 1007, 1012 (S.D. Iowa 2015) (noting that "a blanket exemption for a particular group of employees does not eliminate the need to make a factual determination as to whether class members are actually performing similar duties."); *Rivet v. Office Depot, Inc.*, 207 F. Supp. 3d 417, 424 (D.N.J. 2016) (acknowledging that even where uniform policies were in place, the court must examine "the actual work performed by [employees] on a daily basis" to determine whether they were similarly situated); *Venegas v. Glob. Aircraft Serv., Inc.*, 159 F. Supp. 3d 93, 107 (D. Me. 2016) (examining actual business operations to determine whether propriety of classification could be determined with collective proof). *See also Schaefer v. Indiana Michigan Power Co.*, 358 F.3d

394, 400 (6th Cir. 2004) (in determining whether an employee's job duties fall within an FLSA exemption, courts "focus on evidence regarding the actual day-to-day activities of the employee rather than more general job descriptions contained in resumes, position descriptions, and performance evaluations.").

As a result, the Court must look to the depositions and declarations of Inspectors and WGM employees to determine whether Inspectors are similarly situated with regard to their *de facto* job duties, irrespective of their official title, job description, and classification. As detailed below, the evidence before the Court overwhelmingly supports a finding that all inspectors are similarly situated and decertification is improper on these grounds.

In its briefing, WGM attempts to highlight the dissimilar nature of Inspectors' duties by offering the following examples:

> For example, Utility Inspectors were often called upon to ensure that ditches were properly excavated or that right-of ways were properly cleared. They also could perform tasks such as watching the contractor build a barbwire fence or backfill the pipe or conduct hydrotesting on the pipe to be sure the work was performed within specifications. Environmental Inspectors watched for equipment oil spills, ensured that environmental requirements set out in federal, state, and local permits were adhered to, and similar environmental issues. Welding Inspectors would not perform any of those tasks but rather would ensure that pipeline welds met the appropriate standard, the correct grade of materials was utilized, that welding and tie-in procedures are in compliance with the appropriate standards, and were in charge of quality control over the welding of the pipeline. For their part, electrical inspectors would perform an entirely different set of tasks, primarily involving inspecting the installation of electrical equipment and ensuring that all loop, bump, med, and logic checkouts were performed properly.

> Chief Inspectors and Assistant Chief Inspectors likewise had a variety of job duties. The number of subordinate inspectors reporting to them varied greatly, from individual to individual and from project to project. For example, Opt-In Plaintiff Randall Long testified that, when he was a Chief Inspector, from zero to as many as 14 inspectors reported to him at any given time, depending on the project and stage of that project. Even among inspectors holding the same positions, job duties varied dramatically depending on [] their experience, the size and scope of the project, the customer's specifications, and which area of a project they were assigned to on a particular day. For example, while some Inspectors had authority to order contractors to perform remedial work, depending

on the project and supervisor, others did not have this authority and needed approval from their supervisor(s).

(Doc. 111, WGM Decert. Mem. at 30–31) (citing declarations of Finke, Phillips, VanDyk, and Moore; and depositions of Overton, Long, Karl). WGM argues that "[i]t is precisely these types of variations that the district court in *Sloane* found made collective adjudication of the plaintiffs' claims in that case impracticable." (*Id.* at 32 (citing 2017 WL 1105236, at *15)).

The Court disagrees with WGM's position for several reasons. First, while WGM argues that the first paragraph quoted above highlights the differences of each Inspector's responsibilities, the Court finds the opposite to be true. Each of the duties identified generally describes responsibilities such as "ensuring," "watching," or "inspecting." Indeed, WGM's Vice President of the Pipeline Business Unit, Mark Nussbaum offered the simple explanation that Inspectors' typical duties were to "inspect and report" and most of the work performed by Inspectors is manual work performed primarily in the field or a shop. (Doc. 108-16, Nussbaum Dep. at 28:13–15; 57:1–58:2; 59:7 (stressing for a second time that Inspectors are "there to inspect and report.")). Second, this case differs from *Sloane*—which that court expressly acknowledged—because of the overt "DAY" classification given to Inspectors. The *Sloane* court found that "there is no common thread" among the putative plaintiffs, "applicable payroll records reveal that they were likely paid a salary," and "the pay letters at issue are at worst ambiguous and at best clarify that the workers actually received a salary guarantee." 2017 WL 1105236, at *1. At this point of this case, the Court cannot reach similar conclusions. Inspectors' claims that they were paid according to a facially unlawful policy serve as their common thread. Accordingly, the first factor weighs against decertification.

### b. Different Defenses to Which the Plaintiffs may be Subject on an Individual Basis

The second factor of the decertification analysis is whether the plaintiffs may be subject to different defenses on an individual basis. *O'Brien*, 575 F.3d at 584. In this case, the second factor merges with the first (factual and employment settings of the individual plaintiffs) because Plaintiffs' claims turn on the applicability of whether Inspectors were paid a day rate or a guaranteed weekly day rate. If WGM is unable to show that Inspectors were paid on a guaranteed weekly day rate basis that satisfies the salary basis test, none of its exemption defenses will come into play. If WGM succeeds in making its showing, at least two other major issues will require resolution: 1) whether certain deductions to the guaranteed amount of days were lawful; and 2) whether certain exemptions apply to the individual Inspectors.

The first issue will involve some degree of individualized fact finding, but the Court disagrees with WGM's contention that these issues predominate the main issue(s) yet to be determined or will involve overly burdensome individualized inquiries that nullify the benefits of proceeding collectively. Plaintiffs' expert, Collen Vallen, identified a total of 597 weeks in which Inspectors were paid for less days than their purported guarantee would have them compensated for (an "occurrence"). This amounts to 7.2% of the total weeks examined and affects 62.1% of the in the Opt-In Plaintiffs and Class Members. Through the admission of its own expert, WGM argues that these numbers are inflated and the actual number of affected Inspectors is much lower when permissible reductions for salaried employees are taken into consideration. (Doc. 120, WGM Exclusion Mem. at 14–15). The briefing pertaining to WGM's Motion to Exclude also reflects that the vast majority of the remaining occurrences can be resolved with minimal hardship by comparing Inspectors' complete timesheet information to

determine whether the occurrences can be attributed to one of the lawful salary reduction exceptions set forth in 29 C.F.R. § 541.602(a)–(b).

In the event WGM succeeds on its argument that Inspectors were compensated pursuant to a guaranteed weekly daily rate, the second defense-related issue that will demand resolution is whether the administrative, executive, combination, or highly compensated exemption applies to individual Inspectors. Here, the Court also finds insufficient record evidence to warrant decertification. Because the main issue in this case is common to all Inspectors and is subject to common proof, the Court will briefly address some of the facts that make widespread exemptions and/or individualized fact-finding unlikely. In short, the potential for these exemptions does not trump the advantages of proceeding collectively.

The administrative exemption applies to employees who, *inter alia*, performed non-manual work related to the management or operations of the employer's customers, and exercised discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200(a). As discussed at length in the preceding section, Inspectors' primary job duties are decidedly manual in nature. This much was admitted by the very person that oversees and manages their work, Inspections Services Department manager, Andrew Gust. (Doc. 108-13, Gust Dep. at 21:22–22:1 ("Mud, weather, rocks, mountains, swamps, you name it."); 21:11-21 (". . . they're out in the elements all day long, walking, observing, witnessing what the contractor's doing. [. . .] Q. And when you say "out there in the elements," what do you mean? A. They're out there on the construction site, so they're not sitting in an office like me and you.")). These facts tend to weigh against the applicability of the administrative exemption and the highly-compensated exemption, which also requires non-manual work. 29 C.F.R. § 541.601(a).

Further, Inspectors' ability to exercise independent discretion is undermined by the testimony of Inspections Services Department manager, Andrew Gust.  Gust agreed that pipeline installation is subject to very specific guidelines and an Inspector's job is to ensure those guidelines are very exactly followed.  (Doc. 108-13, Gust Dep. at 28:16–25).  No fewer than eight deposed Inspectors generally reported that they had little to no authority to deviate from project plans/regulations or exercise independent judgment.  (*See* Doc. 108-28, Tagarook Dep. at 35:14–36:2; Doc. 108-23, Long Dep. at 41:18–42:8; Doc. 108-124, Popeck Dep. at 29:22–30:1, 30:7–30:12; Doc. 108-25, Mullet Dep. at 74:7–74:14, 76:16–76:21; Doc. 108-26, Hollier Dep. at 15:12–16:8; Doc. 108-27, Clark Dep. at 20:23–21:3, 22:1–22:14; Doc. 108-30, Overton Dep. at 68:12–69:7).  All of this testimony supports the position that Inspectors did not have wide latitude to make independent decisions with respect to matters of importance.

For the executive exemption to apply, employees must have, *inter alia*, regularly directed the work of at least two other employees, and whose recommendations as to the hiring and firing, advancement, or promotion of other employees were given weight.  WGM has indicated that Chief Inspectors and Assistant Chief Inspectors are most likely to fall under this exemption, but other Inspectors typically did not possess these duties.  (Doc. 111, WGM Decert. Mem. at 35–36.)  WGM has identified five individual Inspectors who possess the title Chief Inspector or Assistant Chief Inspector and have opted into this collective action.  (Doc. 110-27, Zammit. Decl. ¶ 7, Ex. F).  The Court cannot justify excluding these individuals from this action given the fact they make up less than 6% of the total Opt-In plaintiffs, share a common thread with other Inspectors, and the Court finds minimal risk of these defenses overwhelming the collective proceeding.  Accordingly, this second factor also weighs against decertification.

### c. The Degree of Fairness and Procedural Impact of Certifying the Action as a Collective Action

The FLSA is a remedial statute that "must not be interpreted or applied in a narrow, grudging manner." *Dunlop v. Carriage Carpet Co.*, 548 F.2d 139, 144 (6th Cir. 1977). Thus, when evaluating the third factor of the decertification analysis, courts consider whether continuing the collective action comports with "the policy behind FLSA collective actions and Congress's remedial intent by consolidating many small, related claims of employees for which proceeding individually would be too costly to be practical." *Monroe*, 860 F.3d at 405. But "the remedial nature of the FLSA, standing alone, does not justify allowing a case to proceed collectively." *Cornell*, 2015 WL 6662919 at *4, quoting *Crawford v. Lexington-Fayette Urban Cty. Gov't*, No. CIV.A. 06-299-JBC, 2008 WL 2885230, at *11 (E.D. Ky. July 22, 2008). Courts must "balance the cost alleviation enjoyed by individual plaintiffs and any increase in judicial efficiency against the potential harm to defendants and any potential judicial inefficiency." *Id.*

While it is true that individuals need not be *identically* situated in order to proceed in a collective action, there must be some cohesiveness among the employees that would allow for economies of collective treatment. "Where opt-in plaintiffs have shown that they are similarly situated," decertification deprives plaintiffs "of the benefit of pooling their resources and judicial economy is reduced." *White v. Baptist Mem'l Health Care Corp.*, No. 08-cv-2478, 2011 WL 1883959, at *14 (W.D. Tenn. May 17, 2011), *aff'd*, 699 F.3d 869 (6th Cir. 2012). But when Plaintiffs are unable to demonstrate that employees are similarly situated, "there is no judicial economy to be gained by allowing their claims to proceed collectively. The only possible results are unfairness to [the employer] and manageability problems for the Court." *Id.*

While various Inspectors may not be identically situated on every project, proceeding collectively promotes judicial economy. If this case were not to proceed collectively, there is a very real possibility of employer retaliation, negative value lawsuits, and fragmented determinations of the common issues in courts situated all across the country. The Court also doubts that decertification would best serve WGM, who could be forced to defend lawsuits containing common issues on a nationwide basis. Finally, the Court finds that proceeding collectively is an especially compelling approach given the fact that many Opt-In Plaintiffs still employed by WGM—or presumably, in the pipeline industry in general—are away from their homes for extended periods of time and/or are working on projects that require their attendance seven days per week.[5] Therefore, all three components of the decertification standard weigh in Plaintiffs' favor. As WGM cites, the decertification inquiry can be simplified down to "whether the differences among the Plaintiffs outweigh the similarities of the practices to which they were allegedly subjected." *Cornell v. World Wide Bus. Servs. Corp.*, No. 2:14-CV-27, 2015 WL 6662919, at *2 (S.D. Ohio Nov. 2, 2015). Simply put, this Court does not believe they do. Accordingly, the Court **DENIES** WGM's Motion to Decertify.

## C.     Plaintiffs' Motion for Class Certification

In addition to seeking to proceed as a collective action for their claims under the FLSA, Plaintiffs also seek to certify three classes for their claims under the OMWA (Ohio), the PMWA (Pennsylvania), and the IMWL (Illinois) under Federal Rules of Civil Procedure 23(a) and 23(b)(3).[6] Ohio, Pennsylvania, and Illinois all have analogous state wage and hour laws that

---

[5] *See* Sec. III.C.2.a.iv *infra* for a case in point (Illinois class representative William Peveto).
[6] Plaintiffs have agreed to voluntarily dismiss their claims under Count III (Ohio record-keeping statute) and Count VI (Illinois record-keeping statute). As such, Plaintiffs do not seek class certification of these claims.

contain the same requirements as those set forth in the FLSA.[7]  Plaintiffs seek to represent the

following classes of claimants:

> All current and former employees of [WGM] who were classified with the paycode "DAY – Non Exempt Day Rate," and who worked in WGM's Pipeline Services Inspection Department as an inspector (or an equivalent position) in Ohio in any workweek between the applicable limitations period (January 26, 2013 for Counts II and III, and January 26, 2011 for Count IV) and the present ("The Ohio Class").

> All current and former employees of [WGM] who were classified with the paycode "DAY – Non Exempt Day Rate," and who worked in WGM's Pipeline Services Inspection Department as an inspector (or an equivalent position) in Pennsylvania in any workweek between the applicable limitations period (November 21, 2013 for Count VIII and November 21, 2012 for Count IX) and the present ("The Pennsylvania Class").

> All current and former employees of [WGM] who were classified with the paycode "DAY – Non Exempt Day Rate," and who worked in WGM's Pipeline Services Inspection Department as an inspector (or an equivalent position) in Illinois in any workweek between the applicable limitations period (November 21, 2013 for Counts V and VI, and November 21, 2011 for Count VII) and the present ("The Illinois Class").

(Doc. 109, Pls.' Cert. Mem. at 26–27).

## 1.      Standard for Class Certification

Federal Rule of Civil Procedure 23(a) provides that class action lawsuits may be certified

if:

> (1) the class is so numerous that joinder of all members is impracticable;

> (2) there are questions of law or fact common to the class;

> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

> (4) the representative parties will fairly and adequately protect the interests of the class.

---

[7] *See* Ohio Minimum Fair Wage Standards Act, Ohio Rev. Code § 4111.03(A); ("OMWA"); Pennsylvania Minimum Wage Act, 43 P. S. § 333.104(c); 34 Pa. Code § 231.41 ("PMWA"); Illinois Minimum Wage Law ("IMWL") 820 Ill. Comp. Sta. 105 § 4a (1).

Fed. R. Civ. P. 23(a)(1)–(4).  In addition to the four requirements set forth in Rule 23(a), the party seeking certification must also demonstrate that it satisfies at least one of the subcategories of Rule 23(b).  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996).  Here, Plaintiffs have moved for certification pursuant to Rule 23(b)(3), which dictates that a class action may proceed when "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

District courts have broad discretion in certifying class actions so as long as they exercise such discretion within the framework of Rule 23.  *Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443, 446 (6th Cir. 2002).  However, a class "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied."  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982); *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) (en banc).  While the plaintiff's likelihood of ultimate success of his or her claims on the merits is not one of the elements of the "rigorous analysis," "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

## 2.      Class Certification Analysis

WGM raises several issues with regard to Plaintiffs' attempt to have Ohio, Pennsylvania, and Illinois classes certified under Federal Rules of Civil Procedure 23(a) and 23(b)(3).  As is the case with most FLSA collective actions also seeking class certification for state law claims, many of the arguments overlap.  This is especially true here, where the parties have engaged in extensive merits-style briefing centered around whether Inspectors were compensated pursuant

to a day rate or on a salary basis. To the extent possible, the Court will not belabor these points but will analyze the facts under the applicable Rule 23 framework.

### a. Rule 23(a) Requirements

### i. Numerosity

Class certification is not appropriate unless the class is so numerous as to render joinder of all members impracticable. *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 541 (6th Cir. 2012); Fed. R. Civ. P. 23(a)(1). "There is no strict numerical test for determining impracticability of joinder," *Am. Med. Sys*, 75 F.3d at 1079, but courts routinely hold that "a class of 40 or more members is sufficient to meet the numerosity requirement." *Castillo v. Morales, Inc.*, 302 F.R.D. 480, 487 (S.D. Ohio 2014) (Marbley, J.).

Beyond sheer numbers, Rule 23(a)(1) requires that joinder be "impracticable," an inquiry that "requires examination of the specific facts of each case and imposes no absolute limitations." *General Tel. Co. v. EEOC,* 446 U.S. 318, 330 (1980). The plaintiff is not required to "establish that it is impossible to join all members of the proposed class[,]" but simply that joinder "would be difficult and inconvenient." *Swigart v. Fifth Third Bank*, 288 F.R.D. 177, 182 (S.D. Ohio 2012) (Black, J.) (quoting *Day v. NLO,* 144 F.R.D. 330, 333 (S.D. Ohio 1992) (Spiegel, J)). Practicability of joinder is informed by "ease of identifying members and determining addresses, ease of service on members if joined, and geographical dispersion among other things." *Turnage v. Norfolk S. Corp.*, 307 F. App'x 918, 921 (6th Cir. 2009).

Here, WGM only contests the numerosity requirement for Plaintiffs' Illinois class. Plaintiffs originally estimated the Illinois class to consist of 19 individuals (Doc. 109, Pls.' Cert. Mem. at 28), but later recharacterized the estimated size of the class to equal WGM's estimated total—27. (Doc. 121, Pls.' Cert. Reply at 22; Doc. 117, WGM Cert. Resp. at 37, n. 100). While this number falls below the 40-member rule of thumb, Plaintiffs argue that the numerosity

requirement is satisfied because courts have certified smaller classes and courts are particularly conservative with the numerosity requirements in certifying employment cases where there is a prevalent fear of employer retaliation. (Doc. 121, Pls.' Cert. Reply at 22 (citing *Swigart*, 288 F.R.D. at 183 ("In employment class actions like this one, a class member's potential fear of retaliation is an important consideration in deciding whether joinder is impracticable and thus whether the numerosity requirement is satisfied."))). *See also*, *Castillo*, 302 F.R.D. at 487 (finding joinder impracticable in an employment class action where "the non-trivial fear of reprisal and posture of economic dependency . . . would likely repress the willingness of the class members to bring suit individually"); *Myers*, 2017 WL 3977956, at *3 (finding joinder impracticable due to retaliation concerns).

These decisions have cited with approval similar cases from outside this Circuit. *See, e.g.*, *Ladegaard v. Hard Rock Concrete Cutters, Inc.,* 2000 WL 1774091, at *4 (N.D. Ill. Dec. 1, 2000) (finding in an employment class action that joinder was impracticable due to "[t]he possibility of retaliation" and the "economic dependency involved in the employment relationship [which] is inherently inhibiting" and which is not cured by "the availability of the FLSA action"); *Damassia v. Duane Reade, Inc.,* 250 F.R.D. 152, 163 (S.D.N.Y. 2008) ("Indeed, it may be that in the wage claim context, the opt-out nature of a class action is a valuable feature lacking in an FLSA collective action, insofar as many employees will be reluctant to participate in the action due to fears of retaliation."); *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 244 (2d Cir. 2011) ("[A]n employee fearful of retaliation or of being 'blackballed' in his or her industry may choose not to assert his or her FLSA rights."). *See also Sanft v. Winnebago Indus., Inc.,* 214 F.R.D. 514, 524 (N.D. Iowa 2003) (compiling cases holding Rule 23's numerosity requirement satisfied because, where some class members are still employed by

the defendant, "concern regarding employer retaliation or reprisal renders individual joinder less practicable").

Therefore, the Court therefore finds that Plaintiff has shown that Rule 23's numerosity requirement is satisfied for all three proposed classes.

### ii.     Commonality

Under Rule 23(a)(2), a plaintiff must show that "there are questions of law or fact common to the class." *Davis v. Cintas Corp.*, 717 F.3d 476, 487 (6th Cir. 2013); Fed. R. Civ. P. 23(a)(2). "Although Rule 23(a)(2) speaks of 'questions' in the plural, [the Sixth Circuit has] said that there need only be one question common to the class." *Sprague*, 133 F.3d at 397. But not just any common question will suffice; the common questions must be capable of "generat[ing] common answers that are likely to drive resolution of the lawsuit." *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 852 (6th Cir. 2013).

The situation contemplated in *Whirlpool* is precisely the situation currently before the Court. This case revolves around whether WGM paid Inspectors a day rate or a salary in violation of the OMWA, the PMWA, and the IMWL, and the FLSA. WGM asserts the defense that Inspectors were lawfully compensated pursuant to a guaranteed weekly day rate that satisfied the FLSA's—and the applicable state laws'—salary basis test. As discussed at length in the previous section, Plaintiffs' claims and WGM's defenses are common to all Inspectors and resolution of that central issue is certainly likely to drive resolution of this case. As such, Plaintiffs have satisfied the commonality requirement for all three proposed classes.

### iii.     Typicality

Rule 23(a)(3) requires that "the claims . . . of the representative parties be typical of the claims . . . of the class." "A claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of the other class members, and if his or her claims are

based on the same legal theory." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007). In other words, typicality is satisfied if the class members' claims are "fairly encompassed by the named plaintiffs' claims." *Sprague,* 133 F.3d at 399 (quoting *Am. Med. Sys.,* 75 F.3d at 1082). "This requirement insures that the representatives' interests are aligned with the interests of the represented class members so that, by pursuing their own interests, the class representatives also advocate the interests of the class members." *Whirlpool Corp.*, 722 F.3d at 852–53.

The concepts of commonality and typicality "tend to merge" in practice because they both "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Dukes,* 564 U.S. at 349 n.5 (quoting *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 157-58 n. 13 (1982)).

Consistent with this merging, Plaintiffs contend that the named Plaintiffs' claims are typical of other putative class members because of their now-familiar argument that all Inspectors were compensated uniformly pursuant to a day rate. (Doc. 109, Pls.' Cert. Mem. at 31). WGM, however, contends that the named Plaintiffs received a salary at all times relevant, and therefore are pursuing claims that are atypical of other class members who purport to have been compensated on a day rate basis. (Doc. 117, WGM Cert. Resp. at 35–36). This argument does not pass muster. WGM cannot steadfastly argue that all Inspectors were compensated on a salary basis at every turn, and then claim that the named Plaintiffs are atypical for the purposes of this lone analysis.

In sum, the Court agrees with Plaintiffs that they and the putative class have suffered the same alleged injury (misclassification as exempt employees, resulting in unpaid overtime wages)

and the class's claims are "fairly encompassed by the named plaintiffs' claims." *Sprague,* 133 F.3d at 399.

### iv. Adequacy

Rule 23(a)(4) allows certification only if "the representative parties will fairly and adequately protect the interests of the class." "This prerequisite is essential to due process, because a final judgment in a class action is binding on all class members." *Am. Med. Sys.,* 75 F.3d at 1083. Class representatives must meet two criteria to satisfy adequacy: "(1) the representative must have common interests with unnamed members of the class, and (2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Id.*

At this juncture, it hardly bears repeating that the named Plaintiffs have common interests with the putative class members. The Court does note that there is no evidence of any conflict of interest that would prevent the named Plaintiffs from fairly and adequately representing the interests of the class and WGM does not contest that Plaintiffs' legal counsel are adequate representatives of the putative class. However, WGM does raise one adequacy-related issue that warrants the Court's attention. Both Plaintiffs and WGM have acknowledged that the representative of the Illinois class, William Peveto failed to appear for deposition. During the pendency of discovery, Peveto was still employed with WGM and was working on a project that required his attendance seven days per week. (Doc. 109, Pls.' Cert. Mem. at 32, n. 22). Peveto made himself available for deposition during time off on a Sunday morning, but defense counsel was unavailable. (*Id.*). This Court has no issue with Peveto remaining as the Illinois class representative in light of the facts that he now has a different job and has made himself available to be deposed. (Doc. 121, Pls.' Cert. Reply at 21, n. 13). Accordingly, the Court finds that Plaintiffs have satisfied Rule 23's adequacy requirement.

### b.     Rule 23(b)(3) Requirements

To certify a class under Rule 23(b)(3), the Court must find both that (1) questions of law or fact common to class members predominate over any questions affecting only individual members and (2) class treatment is superior to other available methods for fairly and efficiently adjudicating the controversy.  Fed. R. Civ. P. 23(b)(3).  As the Advisory Committee's Notes of 1966 indicate, the purpose of Rule 23(b)(3) is to "achieve economies of time, effort, and expense, and promote, uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results" where other provisions of Rule 23(b) are not applicable.

### i.     Predominance of common questions

The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 594 (1997).  "To meet the predominance requirement, a plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only individualized proof." *Young*, 693 F.3d at 544 (quoting *Randleman v. Fid. Nat. Title Ins. Co.*, 646 F.3d 347, 352–53 (6th Cir. 2011)).  "Plaintiffs need not prove that every element can be established by classwide proof." *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 468 (6th Cir. 2017) (citing *Bridging Communities Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1124 (6th Cir. 2016), *cert. denied*, No. 16-1336, 2017 WL 1807143 (Oct. 2, 2017)).  But the key is to "identify[ ] the substantive issues that will control the outcome," in other words, courts should "consider how a trial on the merits would be conducted if a class were certified." *Sandusky Wellness Ctr.*, 863 F.3d at 468, (quoting *Gene & Gene, LLC v. BioPay, LLC*, 541 F.3d 318, 326 (5th Cir. 2008)).  "[T]he fact that a defense may arise and may affect different class members differently does not compel a finding that individual issues

predominate over common ones." *Young*, 693 F.3d at 544 (quoting *Beattie*, 511 F.3d at 564 (6th Cir. 2007)).

As discussed at length above, the controlling issue in this case is common to all class members, *i.e.*, whether Inspectors were paid pursuant to a day rate or on a salary basis. The only issues identified that by WGM that may be subject to individualized inquiries are 1) whether certain FLSA exemptions apply to a small subset of the putative plaintiffs; and 2) whether certain reductions to employees' salaries were consistent with the FLSA. Both of these circumstances are predicated on a finding that WGM's compensation plan passes the salary basis test.[8]

Ultimately, these individual inquiries—if they come to pass— will not be so intensive as to predominate over the central issue in this case, which is both common and likely to drive resolution of this lawsuit. The Court is therefore persuaded that the necessary individual inquiries will not result in the "myriad mini-trials that Rule 23(b)(3) seeks to prevent." *Sandusky Wellness Ctr.,* 863 F.3d at 470.

## ii. Superiority of the class action mechanism

Class treatment is superior to other methods of adjudication when it "will promote economy, expediency, and efficiency." *Salvagne v. Fairfield Ford, Inc.*, 264 F.R.D. 321, 330 (S.D. Ohio 2009) (Spiegel, J.). "[W]here many individual inquiries are necessary, a class action is not a superior form of adjudication. However, where a threshold issue is common to all class

---

[8] WGM also contends that Plaintiffs' claims for unjust enrichment are "inherently unsuitable for class certification." (Doc. 117, WGM Cert. Resp. at 41 (citing *Collinge v. IntelliQuick Delivery, Inc.*, No. 2:12-CV-00824 JWS, 2015 WL 1292444, at *14 (D. Ariz. Mar. 23, 2015))). This District has permitted unjust enrichment claims to proceed alongside FLSA claims in the past and the Court sees no difference why Plaintiffs' unjust enrichment claims would require more individualized factfinding than Plaintiffs' other claims. *See Monahan v. Smyth Automotive, Inc.*, 2011 WL 379129, *5 (S.D. Ohio Feb. 2, 2011). Accordingly, the reasoning set forth in this Section applies equally to Plaintiffs' unjust enrichment claims.

members, class litigation is greatly preferred." *Vassalle v. Midland Funding LLC*, 708 F.3d 747,

758 (6th Cir. 2013) (quoting *Young*, 693 F.3d at 545).

Rule 23 sets forth four non-exhaustive factors to consider in determining superiority:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). Plaintiffs argue, and the Court agrees, that the balance of these factors

weigh in favor of class treatment in this case. First, individual class members likely have little

interest in commencing or controlling separate actions due to the retaliation concerns discussed

*supra* and the real possibility that individual actions would be cost prohibitive. Second, there are

no other currently pending actions related to WGM's failure to pay overtime wages to its

inspectors. Third, neither party has made a compelling argument that this District is more or less

appropriate than any other forum. Fourth, the class action will be manageable given the

relatively small class size and limited necessary individual inquiries.

WGM does not address all four of the above factors, but instead argues that class

treatment is not superior in this case because it will confuse jurors. Specifically, WGM contends

that adjudicating the claims of 93 Opt-In Plaintiffs and 122 combined Rule 23 Class Members

under the FLSA and three separate states' laws in one action invariably leads to class overlap and

jurors will be faced with the near-impossible task of applying four different sets of laws and corresponding limitations periods to Opt-In Plaintiffs and Class Members, considering evidence with respect to some claims but excluding the same evidence as to other claims, and potentially finding the same person both properly and improperly classified depending on the state, project and/or time frame that he or she worked.

(Doc. 117, WGM Cert. Resp. at 32–33). For their part, Plaintiffs simply state that "the classes will be manageable because they are capable of common proof, which will promote consistent results." (Doc. 109, Pls.' Cert. Mem. at 34). The Court acknowledges that there will inevitably be some level of overlap between the FLSA collective action and the Rule 23 class action—and in some limited cases between the FLSA collective action and more than one class—but these concerns are not sufficient to warrant a denial of class certification, particularly "where a threshold issue is common to all class members . . . ." *Vassalle*, 708 F.3d at 758.

For the above-stated reasons, Plaintiffs' Motion for Class Certification is **GRANTED**.

## IV.    CONCLUSION

For the foregoing reasons,

(1) WGM's Motion to Exclude is **DENIED**;

(2) WGM's Motion to Decertify is **DENIED**; and

(3) Plaintiffs' Motion for Class Certification is **GRANTED**.

The Court further recommends that the parties engage in mediation to resolve the claims at issue. If the parties wish to participate in mediation, they may contact Judge Smith's chambers at (614) 719-3220 or Judge Jolson's chambers at (614) 719-3470 to schedule a mediation through the Court.

The Clerk shall remove Documents 108, 110, and 119 from the Court's pending motions list.

**IT IS SO ORDERED.**

 */s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**